1

**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
555 SOUTH FLOWER STREET, SUITE 3500

2  LOS ANGELES, CA  90071-2411
TELEPHONE:     213.972.4500

3  FACSIMILE:     213.486.0065

4  ROBERT C. LEVENTHAL, CA Bar No. 119969
RLEVENTHAL@FOLEY.COM

5  Attorneys for Plaintiffs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FILED

2012 JAN 27  AM 10: 25

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

HOSPITAL OF BARSTOW, INC., a
Delaware Corporation; FALLBROOK
HOSPITAL CORPORATION, a
Delaware Corporation; WATSONVILLE
HOSPITAL CORPORATION, a
Delaware Corporation; SAN BENITO
HEALTH CARE DISTRICT, a
California Local Health Care District;
HOAG MEMORIAL HOSPITAL
PRESBYTERIAN, a California
Corporation; KAWEAH DELTA
HEALTH CARE DISTRICT, a
California Local Health Care District;
ANAHEIM MEMORIAL MEDICAL
CENTER, a California Corporation;
LONG BEACH MEMORIAL
MEDICAL CENTER, a California
Corporation; ORANGE COAST
MEMORIAL MEDICAL CENTER, a
California Corporation; SADDLEBACK
MEMORIAL MEDICAL CENTER, a
California Corporation; PIONEERS
MEMORIAL HEALTHCARE
DISTRICT, a California Local Health
Care District; SALINAS VALLEY
MEMORIAL HEALTHCARE
SYSTEM, a California Local Health
Care District; SAN ANTONIO
COMMUNITY HOSPITAL, a California
Corporation; SIERRA VIEW LOCAL
HEALTH CARE DISTRICT, a
California Local Health Care District;
SRM ALLIANCE HOSPITAL
SERVICES, a California Nonprofit
Corporation dba PETALUMA VALLEY

Case No:  CV11-10638 ~~SJO(Ex)~~

CAS (MANx)

**AMENDED COMPLAINT FOR:**

(1) Violation of Administrative
    Procedure Act, 5 U.S.C. §§ 701-706;

(2) Declaratory Relief

COPY

HOSPITAL; MISSION HOSPITAL REGIONAL MEDICAL CENTER, a California Nonprofit Corporation; QUEEN OF THE VALLEY MEDICAL CENTER, a California Nonprofit Corporation; REDWOOD MEMORIAL HOSPITAL OF FORTUNA, a California Nonprofit Corporation; SANTA ROSA MEMORIAL HOSPITAL, a California Nonprofit Corporation; ST. JOSEPH HOSPITAL OF EUREKA, a California Nonprofit Corporation; ST. JOSEPH HOSPITAL OF ORANGE, a California Nonprofit Corporation; ST. JUDE HOSPITAL, a California Nonprofit Corporation; ST. MARY MEDICAL CENTER, a California Nonprofit Corporation; TAHOE FOREST HOSPITAL DISTRICT, a California Local Health Care District; TENET HEALTHSYSTEM DESERT, INC., a California Corporation; DOCTORS HOSPITAL OF MANTECA, INC., a California Corporation; DOCTORS MEDICAL CENTER OF MODESTO, INC., a California Corporation; FOUNTAIN VALLEY REGIONAL HOSPITAL AND MEDICAL CENTER, a California Corporation; JFK MEMORIAL HOSPITAL, INC., a California Corporation; SAN RAMON REGIONAL MEDICAL CENTER, INC., a California Corporation; LAKEWOOD REGIONAL MEDICAL CENTER, INC., a California Corporation; LOS ALAMITOS MEDICAL CENTER, INC., a California Corporation; PLACENTIA-LINDA HOSPITAL, INC., a California Corporation; SIERRA VISTA HOSPITAL, INC., a California Corporation; TWIN CITIES COMMUNITY HOSPITAL, INC., a California Corporation; TENET HEALTHSYSTEM KNC, INC., a California Corporation; SAN DIMAS COMMUNITY HOSPITAL, a California Corporation; COMMUNITY HOSPITAL OF LOS GATOS, INC., a California Corporation; TENET 1500 SAN PABLO, INC., a California Corporation; MEDICAL CENTER OF GARDEN GROVE, a California Corporation; AMI/HTI TARZANA JOINT VENTURE, a Delaware General

2

AMENDED COMPLAINT
CASE NO. CV11-10638 SJO (Ex)

Partnership; AMISUB (IRVINE MEDICAL CENTER), a California Corporation; UHS-CORONA, INC., a California Corporation; LANCASTER HOSPITAL CORPORATION, a California Corporation; UNIVERSAL HEALTH SERVICES OF RANCHO SPRINGS, INC., a California Corporation; SAN GORGONIO MEMORIAL HOSPITAL, a California Corporation; ADVENTIST HEALTH CLEARLAKE HOSPITAL, a California Corporation; CENTRAL VALLEY GENERAL HOSPITAL, a California Corporation; FEATHER RIVER HOSPITAL, a California Corporation; GLENDALE ADVENTIST MEDICAL CENTER, a California Corporation; HANFORD COMMUNITY HOSPITAL, a California Corporation; SAN JOAQUIN COMMUNITY HOSPITAL, a California Corporation; SIMI VALLEY HOSPITAL & HEALTH CARE SERVICES, a California Corporation; SONORA COMMUNITY HOSPITAL, a California Corporation; UKIAH ADVENTIST HOSPITAL, a California Corporation; WHITE MEMORIAL MEDICAL CENTER, a California Corporation; WILLITS HOSPITAL, INC., a California Corporation; SANTA BARBARA COTTAGE HOSPITAL, a California Nonprofit Corporation; GOLETA VALLEY COTTAGE HOSPITAL, a California Nonprofit Corporation,

Plaintiffs,

v.

KATHLEEN SEBELIUS, SECRETARY OF UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendant.

3

4824-2240-1806.2

Plaintiff hospitals hereby aver as follows:

## JURISDICTION AND VENUE

1.     Plaintiffs, California hospitals who provide hospital outpatient services to Medi-Cal beneficiaries, bring this action to compel Kathleen Sebelius, Secretary of the United States Department of Health and Human Services, to comply with the mandatory provisions of the Administrative Procedure Act ("APA") as codified at 5 U.S.C. § 701 *et seq.* and with federal Medicaid law pursuant to 28 U.S.C. § 1361.

2.     Venue lies in this judicial district because some of the Plaintiffs are located and reside within this judicial district and the consequences of Defendant's unauthorized and arbitrary activities are occurring within this judicial district.

## THE PARTIES

3.     Plaintiff, Hospital of Barstow, Inc., a Delaware corporation, owns and operates Barstow Community Hospital located in Barstow, California, which is its principal place of business.  At all times in the last five years, Barstow Community Hospital was a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

4.     Plaintiff, Fallbrook Hospital Corporation, a Delaware corporation, owns and operates Fallbrook Community Hospital, located in Fallbrook, California, which is its principal place of business.  At all times within the last five years, Fallbrook Community Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

5.     Plaintiff, Watsonville Hospital Corporation, a Delaware corporation, owns and operates Watsonville Community Hospital in Watsonville, California, which is its principal place of business.  At all times in the last five years, Watsonville Community Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all

times relevant herein.

6.     Plaintiff, San Benito Health Care District, a California local health care district formed as a public agency under California Health & Safety Code Section 32000 *et seq.*, owns and operates Hazel Hawkins Memorial Hospital in Hollister, California, which is its principal place of business.  At all times within the last five years, Hazel Hawkins Memorial Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

7.     Plaintiff, Hoag Memorial Hospital Presbyterian, a California corporation, owns and operates Hoag Memorial Hospital in Newport Beach, California, which is its principal place of business.  At all times within the last five years, Hoag Memorial Hospital has been a duly licensed acute care hospital that and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

8.     Plaintiff, Kaweah Delta Health Care District, a California local health care district formed under California Health & Safety Code Section 32000 *et seq*, owns and operates Kaweah-Delta District Hospital in Visalia, California, which is its principal place of business.  At all times within the last five years, Kaweah-Delta District Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

9.     Plaintiff, Anaheim Memorial Medical Center, is a California corporation which owned and operated Anaheim Memorial Medical Center in Anaheim, California, until July 1, 2009.  Anaheim, California, is Plaintiff's principal place of business.  At all times during the relevant time period until July 1, 2009, Anaheim Memorial Medical Center has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

10.     Plaintiff, Long Beach Memorial Medical Center, a California corporation, owns and operates Long Beach Memorial Medical Center in Long Beach, California, and Earl & Lorraine Miller Children's Hospital of Long Beach in Long Beach, California.  Long Beach, California is Plaintiff's principal place of business.  At all times within the last five years, Long Beach Memorial Medical Center and Earl & Lorraine Miller Children's Hospital of Long Beach have each been a duly licensed acute care hospital, and have each provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

11.     Plaintiff, Orange Coast Memorial Medical Center, a California corporation, owns and operates Orange Coast Memorial Medical Center in Fountain Valley, California, which is its principal place of business. At all times within the last five years, Orange Coast Memorial Medical Center has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

12.     Plaintiff, Saddleback Memorial Medical Center, a California corporation, owns and operates Saddleback Memorial Medical Center with campuses located in Laguna Hills, California and San Clemente, California.  Its principal place of business is Laguna Hills, California.  At all times within the last five years, Saddleback Memorial Medical Center has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

13.     Plaintiff, Pioneers Memorial Healthcare District, a California local health care district formed under California Health & Safety Code Section 32000 *et seq.*, owns and operates Pioneers Memorial Hospital in Brawley, California, which is its principal place of business.  At all times within the last five years, Pioneers Memorial Hospital has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

AMENDED COMPLAINT
CASE NO. CV11-10638 SJO (Ex)

4824-2240-1806.2

14.     Plaintiff, Salinas Valley Memorial Healthcare System, a California local health care district formed under California Health & Safety Code Section 32000 *et seq.*, owns and operates Salinas Valley Memorial Hospital in Salinas, California, which is its principal place of business.  At all times within the last five years, Salinas Valley Memorial Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

15.     Plaintiff, San Antonio Community Hospital, a California corporation, owns and operates San Antonio Community Hospital in Upland, California, which is its principal place of business.  At all times within the last five years, San Antonio Community Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

16.     Plaintiff, Sierra View Local Health Care District, a California local health care district formed under California Health & Safety Code Section 32000 *et seq.*, owns and operates Sierra View District Hospital in Porterville, California, which is its principal place of business.  At all times within the last five years, Sierra View District Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

17.     Plaintiff, SRM Alliance Hospital Services, a California nonprofit corporation doing business as Petaluma Valley Hospital of which Santa Rosa Memorial Hospital is its sole corporate member, owns and operates Petaluma Valley Hospital in Petaluma, California, which is its principal place of business. At all times within the last five years, Petaluma Valley Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

18.     Plaintiff, Mission Hospital Regional Medical Center, a California

7

nonprofit corporation of which St. Joseph Hospital System is its sole corporate member, owns and operates Mission Hospital Regional Medical Center in Mission Viejo, California, which is its principal place of business.  At all times within the last five years, Mission Hospital Regional Medical Center has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

19.     Plaintiff, Queen of the Valley Medical Center, a California nonprofit corporation of which St. Joseph Hospital System is its sole corporate member, owns and operates Queen of the Valley Medical Center in Napa Valley, California, which is its principal place of business.  At all times within the last five years, Queen of the Valley Medical Center has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

20.     Plaintiff, Redwood Memorial Hospital of Fortuna, a California nonprofit corporation of which St. Joseph Hospital System is its sole corporate member, owns and operates Redwood Memorial Hospital of Fortuna in Fortuna, California, which is its principal place of business.  At all times within the last five years, Redwood Memorial Hospital of Fortuna has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

21.     Plaintiff, Santa Rosa Memorial Hospital, a California nonprofit corporation of which St. Joseph Hospital System is its sole corporate member, owns and operates Santa Rosa Memorial Hospital in Santa Rosa, California, which is its principal place of business.  At all times within the last five years, Santa Rosa Memorial Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

22.     Plaintiff, St. Joseph Hospital of Eureka, a California nonprofit

8

corporation of which St. Joseph Hospital System is its sole corporate member, owns and operates St. Joseph Hospital of Eureka in Eureka, California, which is its principal place of business. At all times within the last five years, St. Joseph Hospital of Eureka has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

23.   Plaintiff, St. Joseph Hospital of Orange, a California nonprofit corporation of which St. Joseph Hospital System is its sole corporate member, owns and operates St. Joseph Hospital of Orange in Orange, California, which is its principal place of business. At all times within the last five years, St. Joseph Hospital of Orange has been a duly licensed acute care hospital and has provided outpatient hospital services to Medi-Cal patients at all times relevant herein.

24.   Plaintiff, St. Jude Hospital, a California nonprofit corporation of which St. Joseph Hospital System is its sole corporate member, owns and operates St. Jude Medical Center in Fullerton, California, which is its principal place of business. At all times within the last five years, St. Jude Medical Center has been a duly licensed acute care hospital and has provided hospital outpatient services continuously to Medi-Cal patients at all times relevant herein.

25.   Plaintiff, St. Mary Medical Center, a California nonprofit corporation of which St. Joseph Hospital System is its sole corporate member, owns and operates St. Mary Medical Center in Apple Valley, California, which is its principal place of business. At all times within the last five years, St. Mary Medical Center has been a duly licensed acute care hospital and has provided hospital outpatient services continuously to Medi-Cal patients at all times relevant herein.

26.   Plaintiff, Tahoe Forest Hospital District, a California local health care district formed under California Health & Safety Code Section 32000 *et seq.*, owns and operates Tahoe Forest Hospital in Truckee, California, which is its principal

AMENDED COMPLAINT
CASE NO. CV11-10638 SJO (Ex)

4824-2240-1806.2

place of business.  At all times within the last five years, Tahoe Forest Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

27.     Plaintiff, Tenet HealthSystem Desert, Inc. a California corporation, owns and operates Desert Regional Medical Center in Palm Springs, California, which is its principal place of business. At all times within the last five years, Desert Regional Medical Center has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

28.     Plaintiff, Doctors Hospital of Manteca, Inc., a California corporation, owns and operates Doctors Hospital of Manteca in Manteca, California, which is its principal place of business. At all times within the last five years, Doctors Hospital of Manteca has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

29.     Plaintiff, Doctors Medical Center of Modesto, Inc., a California corporation, owns and operates Doctors Medical Center of Modesto in Modesto, California, which is its principal place of business. At all times within the last five years, Doctors Medical Center of Modesto has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

30.     Plaintiff, Fountain Valley Regional Hospital and Medical Center, a California corporation, owns and operates Fountain Valley Regional Medical Center in Fountain Valley, California, its principal place of business. At all times within the last five years, Fountain Valley Regional Medical Center has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

31.     Plaintiff, JFK Memorial Hospital, Inc., a California corporation, owns

and operates John F. Kennedy Memorial Hospital in Indio, California, which is its principal place of business.  At all times within the last five years, John F. Kennedy Memorial Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

32.    Plaintiff, San Ramon Regional Medical Center, Inc., a California corporation, owns and operates San Ramon Regional Medical Center in San Ramon, California, which is its principal place of business. At all times within the last five years, San Ramon Regional Medical Center has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

33.    Plaintiff, Lakewood Regional Medical Center, Inc., a California corporation, owns and operates Lakewood Regional Medical in Lakewood, California, which is its principal place of business. At all times within the last five years, Lakewood Regional Medical Center has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi- Cal patients at all times relevant herein.

34.    Plaintiff, Los Alamitos Medical Center, Inc., a California corporation, owns and operates Los Alamitos Medical Center in Los Alamitos, California, which is its principal place of business.  At all times within the last five years, Los Alamitos Medical Center has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

35.    Plaintiff, Placentia-Linda Hospital, Inc., a California corporation, owns and operates Placentia-Linda Hospital in Placentia, California, which is its principal place of business.  At all times within the last five years, Placentia-Linda Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

36.     Plaintiff, Sierra Vista Hospital, Inc., a California corporation, owns and operates Sierra Vista Regional Medical Center in San Luis Obispo, California, which is its principal place of business.  At all times within the last five years, Sierra Vista Regional Medical Center has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

37.     Plaintiff, Twin Cities Community Hospital, Inc. a California corporation, owns and operates Twin Cities Community Hospital in Templeton, California, which is its principal place of business.  At all times within the last five years, Twin Cities Community Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

38.     Plaintiff, Tenet HealthSystem KNC, Inc., a California corporation whose principal place of business is Los Angeles, California, owned and operated USC Kenneth Norris, Jr. Cancer Center in Los Angeles, California until and including March 31, 2009.  At all times during the relevant time period up to and including March 31, 2009, USC Kenneth Norris, Jr. Cancer Center was a duly licensed acute care hospital and provided outpatient hospital services continuously to Medi-Cal patients.

39.     Plaintiff, San Dimas Community Hospital, a California corporation whose principal place of business is San Dimas, California, owned and operated San Dimas Community Hospital until and including June 30, 2008.  At all times during the relevant time period up to and including June 30, 2008, San Dimas Community Hospital was a duly licensed acute care hospital and provided outpatient hospital services continuously to Medi-Cal patients.

40.     Plaintiff, Community Hospital of Los Gatos, Inc., a California corporation whose principal place of business is Los Gatos, California, owned and operated Community Hospital of Los Gatos in Los Gatos, California until and

4824-2240-1806.2

including April 10, 2009.  At all times during the relevant time period up to and including April 10, 2009, Community Hospital of Los Gatos was a duly licensed acute care hospital and provided outpatient hospital services continuously to Medi-Cal patients.

41.   Plaintiff, Tenet 1500 San Pablo, Inc., a California corporation whose principal place of business is Los Angeles, California, owned and operated USC University Hospital in Los Angeles, California until and including March 31, 2009. At all times during the relevant time period up to and including March 31, 2009, USC University Hospital was a duly licensed acute care hospital and provided outpatient hospital services continuously to Medi-Cal patients.

42.   Plaintiff, Medical Center of Garden Grove, a California corporation whose principal place of business is Garden Grove, California, owned and operated Garden Grove Hospital & Medical Center until and including June 30, 2008.  At all times during the relevant time period up to and including June 30, 2008, Garden Grove Hospital & Medical Center was a duly licensed acute care hospital and provided outpatient hospital services continuously to Medi-Cal patients.

43.   Plaintiff, AMI/HTI Tarzana Joint Venture, a Delaware general partnership whose principal place of business is Los Angeles, California, owned and operated Tarzana Encino Regional Medical Center until January 15, 2009, and also owned and operated Encino Tarzana Regional Medical Center until May 31, 2008. At all times during the relevant time period up to and including January 15, 2009, Tarzana Encino Regional Medical Center was a duly licensed acute care hospital and provided outpatient services continuously to Medi-Cal patients.  At all times during the relevant time period up to and including May 31, 2008, Encino Tarzana Regional Medical Center was a duly licensed acute care hospital and provided outpatient services continuously to Medi-Cal patients.

44.   Plaintiff, AMISUB (Irvine Medical Center), a California corporation, owned and operated Irvine Medical Center in Irvine, California until and including

13

4824-2240-1806.2

January 15, 2009.  Irvine, California, is its principal place of business.  At all times relevant until and including January 15, 2009, Irvine Medical Center was a duly licensed acute care hospital and provided outpatient hospital services continuously to Medi-Cal patients.

45.     Plaintiff, UHS-Corona, Inc., a California corporation, owns and operates Corona Regional Medical Center in Corona, California, which is its principal place of business.  At all times within the last five years, Corona Regional Medical Center has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

46.     Plaintiff, Lancaster Hospital Corporation, a California corporation, owns and operates Lancaster Community Hospital in Lancaster, California, which is its principal place of business.  At all times within the last five years, Lancaster Community Hospital has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

47.     Plaintiff, Universal Health Services of Rancho Springs, Inc., a California corporation, owns and operates Southwest Healthcare System–Rancho Springs Medical Center in Murrieta, California, which is its principal place of business.  At all times within the last five years, Southwest Healthcare System–Rancho Springs Medical Center has been a duly licensed acute care hospital and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

48.     Plaintiff, San Gorgonio Memorial Hospital, is a California corporation whose principal place of business is Banning, California.  At all times within the last five years, San Gorgonio Memorial Hospital has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

49.     Plaintiff, Adventist Health Clearlake Hospital, a California corporation, owns and operates St. Helena Hospital Clearlake located in Clearlake, California, which is its principal place of business.  At all times within the last five years, St. Helena Hospital Clearlake has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

50.     Plaintiff, Central Valley General Hospital, a California corporation, owns and operates Central Valley General Hospital located in Hanford, California, which is its principal place of business.  At all times within the last five years, Central Valley General Hospital has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

51.     Plaintiff, Feather River Hospital, a California corporation, owns and operates Feather River Hospital located in Paradise, California, which is its principal place of business.  At all times within the last five years, Feather River Hospital has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

52.     Plaintiff, Glendale Adventist Medical Center, a California corporation, owns and operates Glendale Adventist Medical Center located in Glendale, California, which is its principal place of business.  At all times within the last five years, Glendale Adventist Medical Center has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

53.     Plaintiff, Hanford Community Hospital, a California corporation, owns and operates Hanford Community Medical Center located in Hanford, California, which is its principal place of business.  At all times within the last five years, Hanford Community Medical Center has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal

4824-2240-1806.2

patients at all times relevant herein.

54.     Plaintiff, San Joaquin Community Hospital, a California corporation, owns and operates San Joaquin Community Hospital located in Bakersfield, California, which is its principal place of business.  At all times within the last five years, San Joaquin Community Hospital has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

55.     Plaintiff, Simi Valley Hospital & Health Care Services, a California corporation, owns and operates Simi Valley Hospital located in Simi Valley, California, which is its principal place of business.  At all times within the last five years, Simi Valley Hospital has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

56.     Plaintiff, Sonora Community Hospital, a California corporation, owns and operates Sonora Regional Medical Center located in Sonora, California, which is its principal place of business.  At all times within the last five years, Sonora Regional Medical Center has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

57.     Plaintiff, Ukiah Adventist Hospital, a California corporation, owns and operates Ukiah Valley Medical Center located in Ukiah, California, which is its principal place of business.  At all times within the last five years, Ukiah Valley Medical Center has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

58.     Plaintiff, White Memorial Medical Center, a California corporation, owns and operates White Memorial Medical Center located in Los Angeles, California, which is its principal place of business.  At all times within the last five

16

years, White Memorial Medical Center has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

59.     Plaintiff, Willits Hospital, Inc., a California corporation, owns and operates Frank R. Howard Memorial Hospital located in Willits, California, which is its principal place of business.  At all times within the last five years, Frank R. Howard Memorial Hospital has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

60.     Plaintiff, Santa Barbara Cottage Hospital, a California nonprofit corporation, owns and operates Santa Barbara Cottage Hospital in Santa Barbara, California, which is its principal place of business.  At all times within the past five years, Santa Barbara Cottage Hospital has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

61.     Plaintiff, Goleta Valley Cottage Hospital, a California nonprofit corporation, owns and operates Goleta Valley Cottage Hospital in Goleta Valley, California, which is its principal place of business.  At all times within the past five years, Goleta Valley Cottage Hospital has been a duly licensed acute care hospital, and has provided outpatient hospital services continuously to Medi-Cal patients at all times relevant herein.

62.     Plaintiffs bring this action on their own behalf, and on behalf of their Medi-Cal beneficiary patients.  As set forth herein, the Plaintiffs and Medi-Cal beneficiaries are directly and adversely affected by the Secretary's approval of Medi-Cal rate cuts that result in approved reimbursement rates that are not sufficient to assure that payments are consistent with efficiency, economy, and quality of care and are not sufficient to ensure that care and services are available to Medi-Cal beneficiaries at least to the extent that such care and services are

available to the general public in the geographic area.

## PLAINTIFFS' STANDING AND RIGHT TO SEEK
## ENFORCEMENT OF THE LAW

63.     Each of the Plaintiffs, suing on behalf of itself and on behalf of Medi-Cal beneficiaries, as parties seeking to compel the Secretary to comply with her public duties, has a right and an enforceable interest to maintain this action to require the Secretary to comply with her obligations under the law and to discharge her duties in a manner that is not arbitrary and capricious.

## FEDERAL MEDICAID LAW

64.     Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, the statute establishing the Medicaid program, authorizes federal financial support to states for medical assistance to low-income persons who are aged, blind, disabled, or members of families with dependent children.  The Medicaid program is jointly financed by the federal and state governments, and administered by the states.  The states, in accordance with federal law, decide eligible beneficiary groups, types and ranges of services, payment levels for services, and administrative and operative procedures.  Payment for services is made directly by states to the individuals or entities that furnish the services.  *See* 42 C.F.R. § 430.0.

65.     In order to receive matching federal financial participation, states must agree to comply with the applicable federal Medicaid law and regulations. *See* 42 U.S.C. § 1396 *et seq.*

66.     Federal law requires each state's Medicaid program to be administered by a single state agency, which is charged with the responsibility of establishing and implementing a State Medicaid Plan (the "State Plan") that complies with the provisions of applicable federal Medicaid law.  *See* 42 U.S.C. § 1396a(a)(5);  42 C.F.R. § 431.10.  Each state's State Plan must provide for the provision of certain services, including hospital outpatient services (which are mandatory services that each state that participates in the Medicaid Program is

AMENDED COMPLAINT
CASE NO. CV11-10638 SJO (Ex)

required to provide).  *See* 42 U.S.C. §§ 1396(a)(10)(A) and 1396(d)(a)(2).

67.    Pursuant to 42 U.S.C. § 1396a(a)(30)(A) ("Section 30"), each state's State Plan must:

> provide such methods and procedures relating to the utilization of and the payment for, care and services available under the plan . . . as may be necessary . . . *to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general public in the geographic area.*

(Emphasis added.)

## MEDI-CAL — CALIFORNIA'S MEDICAID PROGRAM

68.    The State of California has elected to participate in the Medicaid program.  California has named its program "Medi-Cal."  *See* CAL. WELF. & INST. CODE § 14000 *et seq.*; 22 Cal. Code Regs. § 50000 *et seq.*  The Department of Health Care Services (the "Department") is the single state agency in California, which is responsible for establishing and complying with the State Plan.

## HOSPITAL OUTPATIENT SERVICES AND MEDI-CAL

69.    The methodology the Department must use to determine Medi-Cal rates for hospital outpatient services is contained in Attachment 4.19-B to the State Plan.  The State Plan provides that reimbursement for hospital outpatient services "will be at the lesser of usual charges or the limits specified in the California Code of Regulations (CCR) Title 22, Division 3, Chapter 3, Article 7 (commencing with Section 51501)."

70.    The State Plan further requires the Department, when setting rates, to: (1) develop an evidentiary base or rate study resulting in the determination of a

19

4824-2240-1806.2

proposed rate; (2) present the proposed rate at a public hearing to gather public input; (3) determine the final rate based on the evidentiary base including the pertinent public input; and (4) establish the payment rate through adoption of regulations specifying such rates.

71.     A number of prior cases have been brought on behalf of hospitals challenging the adequacy of Medi-Cal rates for hospital outpatient services.  These lawsuits include *Barlow Respiratory Hospital v. State Department of Health Services* and *Orthopaedic Hospital v. Belshe*.

72.     In the *Orthopaedic* case, the Ninth Circuit Court of Appeals issued a decision holding that:

> The proper interpretation of [42 U.S.C.] § 1396a(a)(30)(A)'s requirement that payment for services must be consistent with efficiency, economy, and quality of care, and sufficient to ensure access, requires the Department to consider the costs of providing hospital outpatient services.  While the Department's hospital outpatient rates should reflect consideration of many factors, they should also bear a reasonable relationship to an efficient economical hospital's costs in providing quality care.  Since the Department did not adequately consider hospitals' costs when readopting rates, the Department's actions were arbitrary and capricious and contrary to law.
>
> Upon remand, the Department should undertake responsible cost studies that will provide reliable data as to the hospitals' costs in providing outpatient services to the end that it determine the cost to an efficient hospital economically providing quality care.  **The state must**

20

4824-2240-1806.2

**then set rates that have some reasonable relation to**
**such costs, the state bearing the burden of justifying**
**any rate that substantially deviates from such**
**determined costs.**

*Orthopaedic Hospital v. Belshe*, 103 F.3d 1491, 1500 (9th Cir. 1997) (emphasis added).

73.     In the *Barlow* case, the California Court of Appeal held that the Ninth Circuit's *Orthopaedic* decision was collateral estoppel and remanded the matter to the Superior Court for further proceedings consistent with the *Orthopaedic* decision.

74.     The Department has not increased the Medi-Cal rates for hospital outpatient services since July 1, 2004.

75.     Plaintiffs are informed and believe, and on that basis allege, that the Department has never performed a responsible study of the costs that efficient economical hospitals incur in providing quality outpatient services and has never determined whether the rates that are currently in effect, or that were previously in effect, are reasonably related to the costs that efficient and economical hospitals incur in providing quality outpatient services.  Furthermore, plaintiffs are informed and believe, and on that basis allege, that the Department has never performed a responsible study analyzing whether Medi-Cal beneficiaries have the same access to hospital outpatient services as the general population in the geographic area.

76.     The Medicaid Upper Payment Limit, 42 C.F.R. § 447.321, places a cap on the amount that a state can pay for outpatient services provided to Medicaid beneficiaries.  For private hospitals, the Medicaid Upper Payment Limit is the amount that the federal Medicare program would pay for the services in question. For other facilities, the Medicaid Upper Payment Limit is defined as the individual provider's Medicaid costs calculated in accordance with the provisions of 42 C.F.R. § 447.206.  The Medicaid Upper Payment Limit is invariably an amount

lower than the amount that providers usually and customarily charge for the services in question.

## THE SUPPLEMENTAL PAYMENT PROGRAM

77.     Effective April 1, 2009, California implemented a Supplemental Payment Program.  This program provides, *inter alia*, that supplemental payments shall be made to hospitals to bring their total Medi-Cal reimbursement for providing hospital outpatient services to Medi-Cal beneficiaries up to the Upper Payment Limit.  Under this program, California pays the hospitals the difference between the Medi-Cal outpatient rates and the Upper Payment Limit in the form of periodic supplemental payments.  The Supplemental Payment Program is financed in part by a Quality Assurance Fee that is paid by California hospitals.

78.     CMS approved the Supplemental Payment Program.

79.     Plaintiffs do not challenge the Supplemental Payment Program or the adequacy of the payments made thereunder.  Rather, Plaintiffs believe that the Supplemental Payment Program results in payments for hospital outpatient services which are sufficient to meet the requirements of Section 30(a).

## THE HOSPITAL OUTPATIENT RATE CUTS

80.     In early 2008, through Assembly Bill X4 5 ("2008 AB 5"), the California Legislature mandated a flat ten percent reduction in the rates of Medi-Cal reimbursement paid for, among other services, hospital outpatient services. This reduction, which was effectuated through the enactment of Welfare & Institutions Code § 14105.19 (the "10% Rate Cut"), went into effect for services rendered on or after July 1, 2008.  Several provider associations challenged the 2008 AB 5 reimbursement reduction as being in conflict with, among other Medicaid Act provisions, Section 30(A).  The litigation concerning the 2008 AB 5 payment reductions ultimately culminated in a published Ninth Circuit decision affirming a district court order enjoining the Department from applying the rate reduction to most classes of impacted providers.  In *Indep. Living Ctr. of S. Cal,*

*Inc. v. Maxwell-Jolly,* 572 F.3d 644 (9th Cir. 2009) [hereinafter *"ILCIF"],* the Ninth Circuit affirmed the district court's determination that the plaintiffs in the case were likely to prevail on their claim that 2008 AB 5 was not enacted in accordance with, and therefore is preempted by, Section 30(A) because the State Legislature enacted the rate cut for purely budgetary reasons, without consideration of reliable cost studies or analysis of the potential impact of the rate reductions on beneficiary access to care.

81.     The 2008 AB 5 rate reductions were never enjoined with respect to any classes of hospital services, including hospital outpatient services, because the district court determined that hospitals did not demonstrate irreparable harm resulting from the rate reduction in the form of reduced Medi-Cal beneficiary access to hospital services.  The plaintiffs representing the interests of hospitals did not appeal this conclusion by the district court.  The reductions were in effect from July 1, 2008 through February 28, 2009.  There were two additional hospital outpatient rate cuts, each in the amount of 1%, the were in effect from March 1, 2009 through April 5, 2009, and from January 1, 2011 through April 5, 2011.  The Plaintiffs in the present case filed a state court action in 2010 challenging the adequacy of the Medi-Cal hospital outpatient rates, including the rates in effect during the period that the rate cuts were implemented.

82.     The rate cuts in effect after April 1, 2009, did not affect the total Medi-Cal payments that hospitals received for outpatient services, because the payments under the Supplemental Payment Program made up the difference. Plaintiffs therefore do not challenge the adequacy of the payments that they received for Medi-Cal outpatient services during the time period that the Supplemental Payment Program was in effect.

83.     Under the Medicaid Act, changes in a State Plan must be submitted to, and approved by, CMS.  All of the rate cuts at issue in this case were submitted by the Department to the federal Centers for Medicare & Medicaid Services ("CMS")

23

for approval on or about September 30, 2008 as part of State Plan Amendment 08-009B1 ("SPA 08-009B1").

84.     CMS disapproved SPA 08-009B1 on or about November 18, 2010, on the grounds that the Department "did not provide sufficient information concerning the impact of the proposed reimbursement reductions on beneficiary access to services as required by section 1902(a)(30)(A) of the [Medicaid] Act [which] requires that care and services are available to Medicaid beneficiaries at least to the extent that care and services are available to the general population in the geographic area."

85.     The Department appealed the disapproval of the SPA.  While the appeal was pending, CMS personnel worked closely with the Department to assist the Department in obtaining CMS approval for the rate cuts.  CMS even proofread drafts of the Department's supplemental submissions, commented on the drafts, and corrected typographical errors in the drafts in order to help the Department succeed in its quest to overturn the disapproval of the rate cuts.

86.     In or about March, 2011, the Department submitted documentation to CMS that purported to establish compliance with the requirements of the Medicaid Act.  From March, 2011, through October, 2011, CMS worked with the Department to help it support its claim that the rate cuts were consistent with the Act.  As a result of this work, the Department performed an analysis of Medi-Cal beneficiaries' access to hospital outpatient services and prepared a document entitled "Medi-Cal Fee-For-Service Access Analysis" ("Access Analysis").  A true and correct copy of the Access Analysis is attached hereto as Exhibit "A."

87.     In the section of the Access Analysis addressing the hospital outpatient rate cuts, the Department's sole analysis consisted of its determination that the Medi-Cal utilization rate for hospital outpatient services "remained relatively constant" during the period from 2007 through 2009 and that the percentage of hospitals that provide Medi-Cal services also remained constant.

4824-2240-1806.2

Since this period included the period covered by rate cuts, the Department concluded that the rate cuts did not adversely effect access.

88.     The Department's analysis did not address any of the statutory criteria for determining whether the rates in effect during the time period in question were lawful.  The Department did not compare utilization rates or patterns of Medi-Cal patients with the general population.  It did not look at whether the rates were consistent with efficiency, economy, or quality of care, and it did not look at provider costs or even attempt to determine whether the rates were reasonably related to the costs incurred by efficient economical providers in providing the services at issue.  The Department also did not consider that hospitals are required to provide outpatient services to a large number of Medi-Cal beneficiaries due to the requirements of the federal Emergency Treatment and Active Labor Act ("EMTALA").

89.     The analysis done by the Department fails to support the adequacy of the hospital outpatient rates or the legality of the rate cuts for at least the following reasons:

- The Department failed to compare access of Medi-Cal patients with access of the general public.  It only looked at whether access materially changed during a three year period – not whether it was adequate to begin with.

- The Department ignored the fact that EMTALA requires hospitals to provide emergency services without regard to a patient's ability to pay.  Even if the Medi-Cal rates are woefully inadequate, hospitals must still provide emergency treatment under EMTALA and state law.  It is obviously meaningless to use utilization of services as a gauge of the adequacy of access when access to those services is mandated by law.

- The Medicaid Act requires that the **rates** must be adequate to provide access.  It does not allow a state to rely on EMTALA or mandatory

4824-2240-1806.2

access provisions of state law to afford access to Medicaid patients despite inadequate Medicaid rates.

- The Department ignored the fact that it will take time for hospitals to reduce Medi-Cal services in response to inadequate Medi-Cal rates. A hospital cannot quickly close or reduce the scope of its emergency or other services in response to a rate reduction. It also takes time for a hospital to implement changes to its outpatient programs in order to avoid Medi-Cal patients. In order to cut services to Medi-Cal patients, hospitals must change how they operate. Once these changes are made, they will be hard to reverse, and will likely reduce access by all patients. Once damage to access is done, it will not be easily undone.

- The Department ignored utilization data that demonstrates that Medi-Cal patients do not enjoy the same access to services as the general public. Medi-Cal patients have a higher utilization rate of emergency services, including emergency services provided in hospital emergency rooms, than the general population, and hospitals are required to provide treatment under EMTALA despite the inadequacy of the Medi-Cal rates.

- The Department ignored the fact that the hospitals have been paid the Upper Payment Limit since April 1, 2009, under the Supplemental Payment Program. The Department's data to a large extent simply demonstrates the effects of paying the upper payment limit. It does not demonstrate the adequacy of lower rates.

90. Incredibly, CMS approved SPA 08-009B1. This approval of the rate cuts was arbitrary and capricious and contrary to law because the Department's own Access Study (and the only evidence on which CMS relied) did not even purport to address any of the statutory criteria for establishing the adequacy of Medi-Cal rates.

///

4824-2240-1806.2

# FIRST CAUSE OF ACTION

## (VIOLATION OF ADMINISTRATIVE
## PROCEDURE ACT, 5 U.S.C. §§ 701-706)

91.     Plaintiffs hereby incorporate by reference the prior paragraphs of this Complaint, as though fully set forth herein.

92.     Under the federal Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, courts must overturn agency action that is arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law.

93.     The Secretary's approval of SPA 08-009B1 is the act of an administrative agency and subject to review under the APA.  The Secretary's approval of the SPA insofar as it pertains to hospital outpatient rates is invalid under the APA because it is arbitrary, capricious, an abuse of discretion, and otherwise inconsistent with governing law, because the data before the Secretary did not address any of the statutorily required elements.  There was no analysis of whether the hospital outpatient rates were sufficient to assure that Medi-Cal beneficiaries have the same access to care as the general public in the same geographic area, there was no analysis of whether the rates are consistent with efficiency, economy and quality of care, and there was no analysis of whether the rates are reasonably related to the costs incurred by efficient economical providers.

94.     The Secretary's review and approval of SPA 08-009B1 also is arbitrary and capricious because it occurred in a manner that was inconsistent with the Secretary's own public statements concerning the need for "transparency" in the SPA approval process.  Interested parties were not afforded meaningful access to the information that was being exchanged between CMS and the Department concerning the SPA.

# SECOND CAUSE OF ACTION

## (DECLARATORY RELIEF)

95.     Plaintiffs hereby incorporate by reference the prior paragraphs of this

Complaint, as though fully set forth herein.

96.     An actual and justiciable controversy exists between Plaintiffs and the Secretary regarding whether SPA 08-009B1 setting forth the rate cuts for hospital outpatient services complied with the requirements of the Federal Medicaid Act. Plaintiffs contend that the Secretary's approval of the relevant SPA was arbitrary, capricious, an abuse of discretion and not in accordance with applicable law.

97.     Accordingly, pursuant to 28 U.S.C. § 2201, Plaintiffs request this Court to declare that the rate reductions for hospital outpatient services invalid, unlawful and preempted by federal law.

98.     No administrative appeal process or other administrative remedy is available to Plaintiffs to challenge the rate reductions for hospital outpatient services.

**WHEREFORE,** Plaintiffs pray for judgment as follows:

1.     For an Order declaring that it was arbitrary, capricious, an abuse of discretion and not in accordance with applicable law for the Secretary to approve the SPA purporting to incorporate the rate reductions for hospital outpatient services into California's State Plan.

2.     For an Order setting aside the Secretary's approval of SPA 08-009B1 purporting to incorporate the rate reductions for hospital outpatient services into California's State Plan.

3.     For a Declaration that the Secretary's approval of SPA 08-009B1 was contrary to law and violated the APA and the Medicaid Act.

4.     For the costs of suit, including reasonable attorneys' fees incurred by Plaintiffs, as permitted under 42 U.S.C. § 1988 or otherwise, and

///

///

///

///

AMENDED COMPLAINT
CASE NO. CV11-10638 SJO (Ex)

4824-2240-1806.2

1

5. Such other and further relief as may be just and proper.

2

3 DATED: JANUARY 27, 2012   **FOLEY & LARDNER LLP**
              ROBERT C. LEVENTHAL

4

5

6            BY: _Robert C. Leventhal_

7             ROBERT C. LEVENTHAL
             ATTORNEYS FOR PLAINTIFFS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT
CASE NO. CV11-10638 SJO (Ex)

4824-2240-1806.2

# Medi-Cal Fee-For-Service Access Analysis:
## *Hospital Outpatient & Hospital Inpatient Services*

The California Department of Health Care Services (DHCS) developed this paper in conjunction with the Department's State Plan Amendments to reduce hospital outpatient and certain hospital inpatient provider payments.

<u>Overview of Approach</u>

DHCS's assessment of the state of access to these hospital outpatient and hospital inpatient services in Medi-Cal FFS is based on evaluating available data for the and focuses on the two key areas of utilization and provider availability.  Specifically our analysis includes looking at three measures

1. 3-Year trends in enrollment
2. 3-year trends in utilization per 1,000 eligible member months
3. Trends in provider participation rate

Our assessment includes analyzing the identified data elements both statewide and by two county-based geographic groupings (metropolitan and non-metropolitan).  This enabled DHCS to analyze the availability of services both statewide and in similar county regions.

In addition to the above measures, DHCS has also included in this analysis information on the contracting status of the hospitals statewide as it relates to inpatient hospital services, as well as information on the concentration of inpatient hospital services in contracting facilities.

<u>Methodology</u>

*Data Sources*

For this assessment, DHCS used the best data currently available.  The data for the analyses were from three state sources.  For utilization information, we utilized data from DHCS administered Medi-Cal '35' paid claims files for calendar years 2007-2009.  The Medi-Cal claim files consist of detailed records reflecting payments and services rendered to beneficiaries.  We utilized data for 2007 to 2009 to enable a three-year trend analysis using the most complete data available.

We pulled the data on eligible member months from the Medi-Cal MEDS Eligibility System for the same three-year period of 2007 to 2009.  A Monthly Medi-Cal Eligibility File (MMEF) is created from this MEDS data system, which contains observations reflecting the benefit history for anyone who received Medi-Cal or other state program benefits in the current and previous twelve months.

Finally, the data on the participating providers were obtained from the OSHPD Hospital Annual Financial Disclosure reports.  Additionally, the information on the number of

1

contracting facilities and the concentration of inpatient care in contracting facilities was obtained from the California Medical Assistance Commission.

### *Geographic Grouping*

In our analysis, we looked at utilization and provider availability statewide, as well as by two separate geographic groups: Metropolitan and Non-Metropolitan Counties. These county groups are defined in the same manner as in the other access analyses. DHCS developed the Metropolitan and Non-Metropolitan county groups by using the ERS Rural-Urban Continuum Codes. The Rural-Urban Continuum Codes are calculated by examining the size of a county and its proximity to a metropolitan area. Rural-Urban Continuum Codes form a classification scheme that distinguishes metropolitan counties by the population size of their metro area, and nonmetropolitan counties by degree of urbanization and adjacency to a metro area or areas.

### *Description of Measures*

DHCS chose the three measures included in this analysis based on available data and because they provided the best means of creating a picture of provider availability and Medi-Cal utilization.

1. 3-Year Trends in Enrollment: An important factor in understanding the other measures and what they represent is considering how enrollment has changed over time. We examined the total number of eligible member months by different Medi-Cal subgroups during the 2007 to 2009 period.
2. 3-Year Trends in Utilization per 1,000 Member Months: We examined the volume of care received by Medi-Cal beneficiaries in a 3-year time period, as well as compared various types of service used by different Medi-Cal eligibility subgroups. Data for examining Medi-Cal utilization come from two sources: program enrollment data and claims data. DHCS compiled three years of claims data (calendar years 2007 through 2009) reflecting Medi-Cal beneficiaries' service use. For each of the service areas, healthcare utilization rates were calculated per 1,000 beneficiaries overall as well as using broad age groupings (adult vs. child) and aid codes as a proxy for health and disability status.
3. Trends in Total Participating Providers: We analyzed how many providers the FFS Medi-Cal only population had access to by utilizing information on how many hospital providers reported providing services in Medi-Cal FFS.

### State of Access in Medi-Cal FFS

### *Enrollment Trends*

An important component of an analysis of access must include an understanding of the population in question. The tables below contain information on the enrollment trends by geographic area and sub-population over the three-year time period used in our analysis. Overall, California experienced a 6.4% increase for adults and a 2.8% increase for children in Medi-Cal enrollment from 2007 to

2

2009, with the largest increases for both being in the Families sub-population (14.0% and 9.6%, respectively).

**Table 1:  3 - Year Trend in Enrollment (Eligible Member Months) by Sub-Population: Statewide**

| | Total Eligible Member Months | | | % Change 2007 to 2009 |
|---|---|---|---|---|
| | 2007 | 2008 | 2009 | |
| *Adults* | | | | |
| Aged | 677,952 | 706,188 | 715,116 | 5.5% |
| Blind/Disabled | 4,242,264 | 4,239,648 | 4,278,480 | 0.9% |
| Families | 2,684,952 | 2,811,096 | 3,060,036 | 14.0% |
| Other | 626,376 | 616,536 | 631,512 | 0.8% |
| Undocumented | 6,591,072 | 6,691,524 | 7,080,348 | 7.4% |
| All Adults | 14,822,616 | 15,064,992 | 15,765,492 | 6.4% |
| | | | | |
| *Children* | | | | |
| Blind/Disabled | 998,280 | 1,013,580 | 1,024,092 | 2.6% |
| Families | 6,193,248 | 6,426,888 | 6,786,252 | 9.6% |
| Foster Care | 1,460,220 | 1,426,404 | 1,384,116 | -5.2% |
| Other | 2,741,064 | 2,705,412 | 2,777,184 | 1.3% |
| Undocumented | 2,730,348 | 2,621,304 | 2,541,576 | -6.9% |
| All Children | 14,123,160 | 14,193,588 | 14,513,220 | 2.8% |

3

**Table 2:  3 - Year Trend in Enrollment (Eligible Member Months) by Sub-Population: Metropolitan Counties**

| | Total Eligible Member Months | | | % Change 2007 to 2009 |
|---|---|---|---|---|
| | 2007 | 2008 | 2009 | |
| *Adults* | | | | |
| Aged | 674,940 | 702,840 | 711,360 | 5.4% |
| Blind/Disabled | 4,033,896 | 4,025,232 | 4,058,568 | 0.6% |
| Families | 2,385,864 | 2,506,080 | 2,729,256 | 14.4% |
| Other | 604,164 | 595,044 | 608,988 | 0.8% |
| Undocumented | 6,541,236 | 6,638,028 | 7,019,340 | 7.3% |
| All Adults | 14,240,100 | 14,467,224 | 15,127,512 | 6.2% |
| *Children* | | | | |
| Blind/Disabled | 957,156 | 971,868 | 982,584 | 2.7% |
| Families | 5,588,088 | 5,808,780 | 6,125,748 | 9.6% |
| Foster Care | 1,411,152 | 1,378,560 | 1,336,152 | -5.3% |
| Other | 2,626,488 | 2,583,396 | 2,645,988 | 0.7% |
| Undocumented | 2,704,068 | 2,593,020 | 2,511,996 | -7.1% |
| All Children | 13,286,952 | 13,335,624 | 13,602,468 | 2.4% |

**Table 3:  3 - Year Trend in Enrollment (Eligible Member Months) by Sub-Population: Non-Metropolitan Counties**

| | Total Eligible Member Months | | | % Change 2007 to 2009 |
|---|---|---|---|---|
| | 2007 | 2008 | 2009 | |
| *Adults* | | | | |
| Aged | 3,012 | 3,348 | 3,768 | 25.1% |
| Blind/Disabled | 208,368 | 214,416 | 219,912 | 5.5% |
| Families | 299,100 | 305,004 | 330,768 | 10.6% |
| Other | 22,200 | 21,492 | 22,524 | 1.5% |
| Undocumented | 49,836 | 53,496 | 61,008 | 22.4% |
| All Adults | 582,516 | 597,756 | 637,980 | 9.5% |
| *Children* | | | | |
| Blind/Disabled | 41,124 | 41,700 | 41,520 | 1.0% |
| Families | 605,160 | 618,108 | 660,504 | 9.1% |
| Foster Care | 49,068 | 47,844 | 47,964 | -2.2% |
| Other | 114,564 | 122,016 | 131,196 | 14.5% |
| Undocumented | 26,280 | 28,296 | 29,580 | 12.6% |
| All Children | 836,196 | 857,964 | 910,764 | 8.9% |

The remainder of the analysis will refer back to the information above as it helps to illuminate further the results of the utilization and provider trend analyses.

*Hospital Outpatient Services*

We analyzed the use of hospital outpatient services over a three-year period by looking at utilization of services per 1000 member months by geographic area and sub-population.

Table 5 includes the results of our analysis. The utilization per 1000 of hospital outpatient services for both adults and children and in all geographic areas has remained relatively constant over the 3-year period. It is important to note that as the prior section demonstrated, the Medi-Cal enrollment over the same period increased and therefore a relatively flat utilization rate per 1000 member months actually indicates an increase in overall utilization. Therefore, access to hospital outpatient services remained constant despite an increase in enrollment.

Additionally, it is important to note that based on this analysis, access and utilization were clearly not impacted by the 10% provider payment reduction in effect from July 2008 through February 2009 nor was access impacted by the 1% payment reduction in effect for March and a portion of April 2009.

**Table 4:  Total Hospital Outpatient Services Utilization per 1,000 Beneficiary Months (2007-2009)**

| | Statewide | | | Metropolitan Counties | | | Non-Metropolitan Counties | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2007 | 2008 | 2009 | 2007 | 2008 | 2009 |
| **Adults** | | | | | | | | | |
| Aged | 143.4 | 144.6 | 148.5 | 142.9 | 143.9 | 147.9 | 239.4 | 297.8 | 277.9 |
| Blind/Disabled | 249.9 | 255.9 | 262.5 | 244.4 | 250.1 | 256.7 | 355.5 | 364.2 | 369.1 |
| Families | 172.9 | 169.4 | 172.4 | 164.0 | 160.0 | 163.2 | 244.4 | 246.3 | 248.2 |
| Other | 291.1 | 303.3 | 311.5 | 283.9 | 295.9 | 304.5 | 487.7 | 509.2 | 500.0 |
| Undocumented | 61.4 | 59.4 | 59.3 | 60.8 | 58.9 | 58.8 | 134.3 | 125.7 | 117.7 |
| All Adults | 149.0 | 149.2 | 150.6 | 143.5 | 143.5 | 144.8 | 284.0 | 287.6 | 286.5 |
| **Children** | | | | | | | | | |
| Blind/Disabled | 165.7 | 170.1 | 179.0 | 164.3 | 168.9 | 178.0 | 199.5 | 196.7 | 203.5 |
| Families | 82.4 | 82.4 | 88.7 | 80.2 | 80.2 | 86.4 | 102.4 | 102.6 | 109.7 |
| Foster Care | 69.2 | 69.4 | 73.0 | 68.1 | 68.6 | 72.1 | 101.8 | 92.9 | 96.8 |
| Other | 94.7 | 97.2 | 98.7 | 92.8 | 95.3 | 96.9 | 139.3 | 136.0 | 134.9 |
| Undocumented | 62.8 | 66.5 | 66.9 | 62.6 | 66.3 | 66.7 | 86.2 | 83.6 | 80.8 |
| All Children | 85.5 | 87.2 | 91.6 | 83.9 | 85.7 | 90.0 | 111.7 | 110.8 | 116.0 |

The second part of our analysis includes analyzing whether the percentage of hospitals providing outpatient hospital services to Medi-Cal FFS beneficiaries has been impacted over time. Table 5 provides information on the percentage of all hospitals in California that provided outpatient hospital services to the Medi-Cal FFS population. As the table below demonstrates, the rate of participation among hospital providers has remained constant of the 3-year period, even during the period of the provider payment reductions, and that the vast majority of hospitals provide these services to the FFS population.

5

**Table 5:  Percent of Hospitals Providing Hospital Outpatient Services in Medi-Cal FFS (2007-2009)**

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| **Percent of Hospitals Providing Medi-Cal FFS Inpatient Services** | 81% | 81% | 80% |

It is also important to note that for the public owned hospital providers, those owned by a city, county, hospital district or operated by the University of California, that California operates a CPE-based supplemental payment program that enables those hospital providers to receive supplemental payments up to cost for the hospital outpatient services they provide to Medi-Cal FFS patients.  Therefore, any provider payment reduction to hospital outpatient services is mitigated by those providers ability to still receive total reimbursement up to cost through the supplemental payment program.

*Hospital Inpatient Services*

We analyzed the use of hospital inpatient services over a three-year period by looking at utilization of services per 1000 member months by geographic area and sub-population.

Table 6 includes the results of our analysis.  The utilization per 1000 of hospital outpatient services for both adults and children and in all geographic areas has fluctuated somewhat during the 3-year period, with slight increases in several adult categories between 2007 and 2008 and slight decreases for both adults and children between 2008 and 2009.  However, as noted above, enrollment increased over the 3-year time period and therefore total utilization was not decreasing, but the rate per 1000 decreased slightly.  It is important to note that although the slight increases and decreases in utilization occurred during the same time period as the provider payment reductions to certain non-contract hospitals, that the changes in utilization rates were not significant.  There is no indication, particularly when combined with the provider analysis below, that those reductions therefore had a negative impact on access.

**Table 6:  Total Hospital Inpatient Services Utilization per 1,000 Beneficiary Months (2007-2009)**

|  | Statewide | | | Metropolitan Counties | | | Non-Metropolitan Counties | | |
|---|---|---|---|---|---|---|---|---|---|
|  | 2007 | 2008 | 2009 | 2007 | 2008 | 2009 | 2007 | 2008 | 2009 |
| *Adults* | | | | | | | | | |
| Aged | 111.7 | 110.7 | 104.8 | 111.7 | 110.6 | 104.7 | 112.2 | 126.9 | 109.3 |
| Blind/Disabled | 190.3 | 199.1 | 192.3 | 194.1 | 203.3 | 195.8 | 116.7 | 119.4 | 127.2 |
| Families | 67.4 | 66.3 | 63.8 | 70.9 | 69.3 | 66.8 | 39.6 | 41.9 | 39.2 |
| Other | 223.6 | 232.0 | 221.1 | 226.4 | 234.3 | 223.2 | 147.4 | 168.1 | 163.9 |
| Undocumented | 56.7 | 56.3 | 49.2 | 56.7 | 56.4 | 49.2 | 49.0 | 46.9 | 42.5 |
| All Adults | 106.5 | 108.1 | 100.3 | 107.8 | 109.5 | 101.3 | 72.5 | 75.2 | 74.6 |
| *Children* | | | | | | | | | |
| Blind/Disabled | 93.1 | 101.2 | 105.8 | 94.8 | 103.4 | 107.8 | 53.3 | 49.7 | 57.9 |
| Families | 41.4 | 39.8 | 39.1 | 43.9 | 42.1 | 41.4 | 18.1 | 18.6 | 17.3 |
| Foster Care | 17.6 | 17.5 | 16.5 | 17.7 | 17.7 | 16.8 | 14.4 | 11.9 | 9.3 |
| Other | 61.4 | 61.5 | 55.5 | 62.2 | 62.4 | 56.7 | 44.5 | 42.7 | 30.3 |
| Undocumented | 57.9 | 55.0 | 50.9 | 58.1 | 55.2 | 51.1 | 40.0 | 37.0 | 34.9 |
| All Children | 49.7 | 48.9 | 46.8 | 51.3 | 50.5 | 48.6 | 23.9 | 23.8 | 21.2 |

6

The second part of our analysis includes analyzing whether the percentage of hospitals providing inpatient hospital services to Medi-Cal FFS beneficiaries has been impacted over time. Table 7 provides information on the percentage of all hospitals in California that provided inpatient hospital services in Medi-Cal FFS. We see that nearly all hospitals in California provide inpatient services to Medi-Cal FFS patients and that the percentage of hospitals that provided inpatient services to Medi-Cal FFS beneficiaries has remained constant over the 3-year period. Therefore, there is no indication that the provider payment reductions implemented to non-contract hospitals in 2008 had a negative impact on access to inpatient hospital services.

**Table 7: Percent of Hospitals Providing Hospital Inpatient Services in Medi-Cal FFS (2007-2009)**

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| **Percent of Hospitals Providing Medi-Cal FFS Outpatient Services** | 92% | 92% | 92% |

Finally, the provider payment reductions implemented by California in 2008 for inpatient hospital services were limited to non-contracting hospitals. Therefore, it is important to understand the number of hospitals those reductions impact as well as the amount of care to FFS beneficiaries provided in those facilities. In 2009, of the 437 hospitals in California, there were 203 contracting hospitals (including 21 designated public hospitals that are reimbursed using the CPE methodology). Based on information from CMAC, 86% of the inpatient hospital days for Medi-Cal FFS patients in 2009 were provided in contracting hospitals, meaning only about 14% of the care was provided in facilities that were subject to the payment reductions. We see a similar breakdown of the high concentration of FFS days in contracting hospitals over the 3-year period as demonstrated in Table 8 below.

**Table 8: Medi-Cal FFS Days by Contracting Hospital Status (2007-2009)**

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| **% of FFS Days in Contract Hospitals** | 10.8% | 12.2% | 13.9% |
| **% of FFS Days in Non-Contract Hospitals** | 89.2% | 87.8% | 86.1% |

Based on the overall analysis when we look at the changes in utilization rates coupled with the changes in enrollment, the constant and high level of hospital participation and the high **concentration of M**edi-Cal FFS care in contract facilities, we conclude that the payment reductions implemented for non-contract facilities did not negatively impact access.

7