1

**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
555 SOUTH FLOWER STREET, SUITE 3500
2
LOS ANGELES, CA  90071-2411
TELEPHONE:    213.972.4500
3
FACSIMILE:    213.486.0065

ROBERT C. LEVENTHAL, CA Bar No. 119969
4
RLEVENTHAL@FOLEY.COM

A. JOEL RICHLIN, CA Bar No. 246318
5
JRICHLIN@FOLEY.COM

6    Attorneys for Plaintiffs

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   HOSPITAL OF BARSTOW, INC., et al.,    Case No:  CV-11-10638 SVW (MANx)

12              Plaintiffs,                 **PLAINTIFFS' NOTICE OF
                                            MOTION AND MOTION FOR
13        v.                                SUMMARY JUDGMENT;
                                            MEMORANDUM OF POINTS AND
14   KATHLEEN SEBELIUS, SECRETARY           AUTHORITIES IN SUPPORT
     OF UNITED STATES DEPARTMENT            THEREOF
15   OF HEALTH AND HUMAN
     SERVICES,
16                                          Date:  January 6, 2014
                Defendant.                  Time:  1:30 p.m.
17                                          Ctrm:  6

18                                          Complaint Filed:  December 22, 2011
                                            FAC Filed:  January 27, 2012
19                                          Judge:  Hon. Stephen V. Wilson

20

21

22

23

24

25

26

27

28

---

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
CASE NO.  CV-11-10638 SVW (MANx)

4844-1784-1686.3

# NOTICE OF MOTION

## TO THIS HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE THAT** Plaintiffs Hospital of Barstow, Inc., et al. ("Plaintiffs") hereby move for an order awarding summary judgment pursuant to Federal Rule of Civil Procedure 56(a). Plaintiffs move for summary judgment against the Defendant Secretary of the U.S. Department of Health and Human Services (the "Secretary") on the grounds that there are no material issues of fact in dispute on Plaintiffs' claim for violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and therefore Plaintiffs are entitled to judgment as a matter of law.

This Motion is made pursuant to the Court's November 1, 2013 Order directing the parties to file their cross-motions for summary judgment on November 7, 2013. This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Separate Statement of Uncontroverted Facts and Conclusions of Law filed and served herewith, the complete file in this action, and on such evidence as may be presented at the hearing of the motion.

DATED: NOVEMBER 7, 2013

FOLEY & LARDNER LLP
ROBERT C. LEVENTHAL
A. JOEL RICHLIN

BY: _/S/ ROBERT C. LEVENTHAL_
ROBERT C. LEVENTHAL
ATTORNEYS FOR PLAINTIFFS

4844-1784-1686.3

# <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

I.    INTRODUCTION ..........................................................................................1

II.   FACTUAL BACKGROUND ........................................................................3

III.  LEGAL BACKGROUND.............................................................................7

    A.    Federal Medicaid Law ......................................................................7

    B.    Medi-Cal — California's Medicaid Program .....................................8

    C.    Hospital Outpatient Services Under Medi-Cal .................................8

    D.    Legal Standard For Challenging Agency Action Under The
Administrative Procedure Act.............................................................9

IV.  ARGUMENT ............................................................................................14

    A.    CMS Acted Arbitrarily And Capriciously By Approving The SPA
With No Comparison Of The Access Of Medi-Cal Beneficiaries To
That Of The General Public...............................................................14

    B.    CMS Acted Arbitrarily And Capriciously By Failing to Determine
Whether The Medi-Cal Rates Are Adequate To Provide Access To
Hospital Emergency Services. ..........................................................16

V.    CONCLUSION ........................................................................................20

4844-1784-1686.3

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alaska Dep't of Health & Soc. Svcs. v. Ctrs. for Medicare & Medicaid Servs.*,
   424 F.3d 931 (9th Cir. 2011) ............................................................. 10

*Beno v. Shalala*,
   30 F.3d 1057 (9th Cir. 1994) .............................................................. 9

*Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.*,
   464 U.S. 89, 104 S. Ct. 439, 78 L. Ed. 2d 195 (1983) ....................... 10

*Burlington Truck Lines v. United States*,
   371 U.S. 156, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962) ......................... 10

*Cal. Ass'n of Rural Health Clinics v. Douglas*,
   __ F.3d __, 2013 U.S. App. LEXIS 19215 (Sept. 17, 2013) ....................... 13, 14

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) ....................... 10, 11, 18

*Christ the King Manor v. Secretary HHS*,
   __ F.3d __, 2013 U.S. App. LEXIS 19317 (3d Cir. Sept. 19, 2013)
   .................................................................................. 17, 18, 19

*Friends of Yosemite Valley v. Kempthorne*,
   520 F.3d 1024 (9th Cir. 2008) ........................................................... 10

*L.A. Haven Hospice, Inc. v. Sebelius*,
   638 F.3d 644 (9th Cir. 2011) ............................................................. 14

*Managed Pharm. Care v. Sebelius*,
   716 F.3d 1235 (9th Cir. 2013) .................................................... *passim*

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) ...................... 10

*Orthopaedic Hospital v. Belshe*,
   103 F.3d 1491 (9th Cir. 1997) ...................................................... 3, 5, 11

4844-1784-1686.3

**Federal Statutes**

5 U.S.C. § 706(2)(A) ............................................................................... 10

42 U.S.C. § 1395dd.................................................................................... 2

42 U.S.C. § 1396a(a)(5) ............................................................................ 7

42 U.S.C. § 1396a(a)(30)(A) ..........................................................*passim*

Federal Medicaid Law ............................................................................... 7

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et seq. ............. 7

**California Statutes**

Cal. Welf. & Inst. Code §§ 14000, et seq. ................................................ 8

Cal. Welf. & Inst. Code § 14167.2 ........................................................... 4

**Other Authorities**

42 C.F.R. § 430.0 ...................................................................................... 7

42 C.F.R. §§ 430.15 and 447.201(b) ........................................................ 7

42 C.F.R. § 431.10..................................................................................... 7

42 C.F.R. § 447.321 ................................................................................... 9

22 Cal. Code of Regs. §§ 50000, et seq..................................................... 8

75 Fed. Reg. 73972, 73975 (Nov. 30, 2010) (to be codified at 42
   C.F.R. § 447) ....................................................................................... 9

4844-1784-1686.3

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This case challenges the adequacy of the Centers for Medicare & Medicaid Services' ("CMS") approval of a State Plan Amendment ("SPA") implementing a 10% Medi-Cal hospital outpatient rate cut that was in effect for eight months from July 2008 through February 2009.  CMS initially disapproved the cut on the grounds that "the state did not provide information concerning the impact of the proposed reimbursement reductions on beneficiary access to services **even though available national data indicate that this may be an issue for California.**" (HHS00175.)  CMS's concern was fully supported in its administrative record, which contains data demonstrating that California spends less per enrollee than virtually any other state (HHS00190-191) and was "**the lowest spending state . . . in 2009**."  (HHS00195.)  It also shows that California spent **less than half** of what Medicare spent per California enrollee in 2008 and 2009.  (*Compare* HHS00187-88, *with* HHS00190-91.)

After disapproving the rates, and apparently to facilitate California's budgetary restrictions, CMS collaborated with the California Department of Healthcare Services (the "Department") to get the rates retroactively approved: "CMS has been working with the state to refine the information initially submitted . . . as a . . . **collaborative process**."  (HHS01951.)  CMS then reversed itself and approved the July 2008 rate cut in October 2011, more than three years after it was implemented.  (HHS01951.)  In its approval letter, CMS admitted that the Medicaid Act requires that Medicaid rates be sufficient to ensure that "**care and services are available to Medicaid beneficiaries at least to the extent that care and services are available to the general public in the geographic area**." (HHS01951.)  Notwithstanding this fundamental requirement, the administrative

4844-1784-1686.3

record does not contain the required comparison of access by the general public to access by Medi-Cal patients.  (HHS01951.)

CMS admits that when it approves an SPA it must evaluate the SPA in its entirety, including whether any unchanged SPA sections still comply with the law and regulations:  "[W]e have to know exactly what we are approving each time and that requires a comprehensive review. We cannot re-approve something that is in incorrect [sic] unknowingly as a result of rushing to approve an overall cut like this."  (HHS00001.)  Thus, in approving a rate cut, CMS must not only evaluate the effects of the cut, but it also must evaluate whether the rates prior to the cut were in compliance with the law.

CMS failed to look at the very issue it identified as key to its approval: whether Medi-Cal beneficiaries have the same access to hospital outpatient services as the general public.  There is nothing in the administrative record examining and comparing the general public's access to hospital outpatient services to that by Medi-Cal patients.  Thus, CMS has acted arbitrarily and capriciously and contrary to law in approving the hospital outpatient rate cut.

There is an additional issue that differentiates hospital outpatient services from virtually all other Medicaid services.  The Emergency Medical Treatment and Active Labor Act ("EMTALA") requires hospitals to screen all persons who arrive in their emergency departments (and under certain circumstances elsewhere on hospital premises) to determine whether they are suffering from an emergency medical condition.[1]  *See* 42 U.S.C. § 1395dd.  If the person is suffering from an emergency medical condition, the hospital must provide treatment until the emergency medical condition is stabilized **without regard to the patient's ability to pay.**  Thus, hospitals must examine and treat all Medi-Cal patients who show up

---

[1]      Hospital Emergency Department services are outpatient services (unless the patient is admitted to the hospital).

in their emergency rooms until the emergency medical condition has been stabilized. Unless the patient is admitted, hospitals are paid for providing this emergency treatment at the rates established by the Department for outpatient services.

EMTALA thus creates 100% access to hospital emergency rooms and the ancillary hospital outpatient services irrespective of whether the Medi-Cal rates are adequate to provide access.  Because of EMTALA, access to hospital emergency rooms and ancillary outpatient services would remain at 100% for Medi-Cal patients even if Medi-Cal paid nothing.  Yet it would clearly be arbitrary and capricious for CMS to hold that no payment is a rate adequate to ensure that Medi-Cal patients have the same access to care as the general public.  As a matter of law, where access is guaranteed by EMTALA, CMS must examine whether the underlying rate would be sufficient to create the legally required access in the absence of the legal guarantee.

## II.   **FACTUAL BACKGROUND**

Hospital outpatient rates were successfully challenged in *Orthopaedic Hospital v. Belshe*, 103 F.3d 1491 (9th Cir. 1997), over a decade and a half ago.  In that case, the Ninth Circuit held that the Department was required to determine the costs incurred by an efficient economical hospital and to set rates that are reasonably related to those costs.  *Id.* at 1500.  The Department was ordered to perform (but never completed) a rate study to determine appropriate rates.  Instead, it negotiated a settlement with the plaintiffs.  *Id.*  Under that settlement, the hospitals received $350 million for past rate inadequacies and agreed upon rate increases for the fiscal years beginning July 1, 2001, through July 1, 2004.

The Department has not increased the Medi-Cal hospital outpatient rates since July 1, 2004.  Even worse, the Department imposed a 10% rate cut between July 1, 2008, and February 28, 2009, that was mandated by the legislature for

purely budgetary reasons.  The Department implemented this rate cut without first obtaining CMS approval.  CMS initially denied approval of the cut, stating: "**the state did not provide information concerning the impact of the proposed reimbursement reductions on beneficiary access to services even though available national data indicate that this may be an issue for California.**" (HHS00175.)

The Department and the California Legislature know that the Medi-Cal rates are insufficient, standing alone, to compensate hospitals for hospital outpatient services.  In order to improve compensation, the legislature passed the Medi-Cal Hospital Provider Rate Stabilization Act in 2009 (the "Rate Stabilization Act"). *See* Cal. Welf. & Inst. Code § 14167.2.  This Act requires the Department to make supplemental payments to hospitals **in addition to** the Medi-Cal rates in order to bring the total amount paid for hospital outpatient services up to the aggregate amount that would be paid by Medicare for the same services, which is the maximum amount allowed by federal law (the "Upper Payment Limit").  Hospitals have received the supplemental payments required by the Act from April 1, 2009, through the present.  (The "2009 Increase").  In October 2010, CMS approved a State Plan Amendment allowing the supplemental payments to take effect, determining that the supplemental payments were consistent with the requirements of the Medicaid Act.[2]  Inexplicably, **one year after approving the supplemental payments,** the CMS approved the July 2008 rate cut.

Thus, CMS has approved a 10% rate cut for the period of July 2008 through February 28, 2009, and a significant payment increase to the Upper Payment Limit from April 1, 2009, through the present.  This inconsistency, on its face, is

---

[2]     *Available at* http://www.dhcs.ca.gov/formsandpubs/laws/Documents/Supplement%2012%20to%20Att%204.19B.pdf.

sufficient to cast doubt on the integrity of the administrative process.  A review of CMS's administrative record demonstrates there is no support for this inconsistency.

As explained earlier, the Department never complied with the rate-setting standard enunciated in *Orthopaedic.*  In a recent case, *Managed Pharm. Care v. Sebelius*, 716 F.3d 1235 (9th Cir. 2013), the Ninth Circuit addressed its holding in *Orthopaedic.  Id.* at 1245-46.  After first distinguishing *Orthopaedic* as a case where the Secretary's approval was not an issue, it gave deference to CMS's new interpretation of the Medicaid Act which provides that a state is not required to focus on provider costs when setting rates.  *Id.*  Instead, states must demonstrate compliance with the express language in the Medicaid Act which requires that the rates must be sufficient to ensure "that care and services are available under the plan . . . **at least to the extent that such care and services are available to the general population in the geographic area**."  *Id.* at 1241 (emphasis added).

Despite the fact that CMS purports to have determined compliance by California with the access requirements of the Medicaid Act, the administrative record is devoid of the required comparison of the access by Medi-Cal beneficiaries to hospital outpatient services to that enjoyed by the general public. Thus, neither the Department nor CMS have any basis for believing that the hospital outpatient rates (either prior to the rate cut or after it) were adequate to ensure that Medi-Cal beneficiaries had access to hospital outpatient services equal to that of the general public.

Furthermore, the administrative record is replete with data and discussion showing that access is likely a problem.  For example, in its discussion of the access data, the Department states: "It is also important to note that for the publicly owned hospital providers, those owned by a city, county, hospital district or operated by the University of California, that California operates a CPE-based

supplemental payment program **that enables those hospital providers to receive supplemental payments up to cost for the hospital outpatient services they provide to Medi-Cal FFS patients. Therefore, any provider payment reduction to hospital outpatient services is mitigated by those providers' ability to still receive total reimbursement up to cost through the supplemental payment program.**"  (HHS01379.)

This statement contains the following admissions: (1) that supplemental payments are needed for hospitals to recoup the costs they incur in providing hospital outpatient services (which is equivalent to stating that the rates are below cost); (2) that the supplemental payments are necessary in order to achieve access to hospital outpatient services; and (3) that only a small subset of California hospitals, public hospitals, receive the supplemental payments necessary to achieve access.  Thus, the statement is a tacit admission that the hospital outpatient rates, standing alone, are not adequate to meet the minimum access requirements prescribed by law.

The language of the Medicaid statute is clear:  The rates must be adequate to ensure that "care and services are available under the plan at least to the extent that such care and services are available to the general public in the geographic area." 42 U.S.C. § 1396a(a)(30)(A).  Here, the administrative record reflects that is not the case.  The Department admits that additional supplemental payments (which are available only to a small subset of hospitals) are necessary to obtain access. Other hospitals are forced by EMTALA to provide emergency care for inadequate compensation and Medi-Cal beneficiaries are effectively funneled to certain public hospitals that receive supplemental payments for hospital outpatient services (if they happen to live in the vicinity of one of these hospitals).  These supplemental payments are a tacit admission by the Department that Medi-Cal patients do not have the same level of access as the general public to these services.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
CASE NO.  CV-11-10638 SVW (MANx)

4844-1784-1686.3

## III.     LEGAL BACKGROUND

### A.     Federal Medicaid Law

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et seq., the Medicaid Statute, authorizes federal financial support to states for medical assistance to low-income persons who are aged, blind, disabled, or members of families with dependent children.  The program is jointly financed by the federal and state governments and administered by the states, with the federal financial participation level currently ranging between 50 to 83 percent.  In accordance with federal law, states decide eligible beneficiary groups, types and ranges of services, administrative and operative procedures, and payment level for services.  Payment for services is made directly by states to the individuals or entities that furnish the services.  *See* 42 C.F.R. § 430.0

In order to receive matching federal financial participation, states must agree to comply with the applicable federal Medicaid law and regulations, 42 U.S.C. §§ 1396, et seq.  At the state level, the Medicaid program is administered by a single state agency, which is charged with the responsibility of establishing and complying with a state Medicaid plan (the "State Plan") that, in turn, must comply with the provisions of the applicable federal Medicaid law.  *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10.  The State Plan must be submitted to the Secretary for approval and must describe the policies and methods to be used to set payment rates for each type of service included in the state Medicaid plan.  *See* 42 C.F.R. §§ 430.15 and 447.201(b).

Pursuant to 42 U.S.C. § 1396a(a)(30)(A) ("Section 30"), each state's Medicaid plan must:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to . . . *assure that payments are consistent with efficiency, economy, and quality of care **and are sufficient to enlist enough providers so that care and services are available under the***

7

4844-1784-1686.3

*plan at least to the extent that such care and services are available to the general public in the geographic area.*

*Id.* (emphasis added).

### B.    Medi-Cal — California's Medicaid Program

California has elected to participate in the Medicaid program.  California has named its program "Medi-Cal."[3]  *See* Cal. Welf. & Inst. Code §§ 14000, et seq.; 22 Cal. Code of Regs. §§ 50000, et seq.  In adopting the Medi-Cal program, the California Legislature has stressed that all eligible Medi-Cal beneficiaries receive necessary care and has established a system designed to ensure that healthcare providers will be available to render this care.  To achieve this goal of accessible quality healthcare for the poor, and to remain eligible for the federal Medicaid subsidies, the California Legislature enacted a statutory scheme designed to enhance the Medicaid program's effectiveness.  This system includes provisions purportedly ensuring that healthcare providers receive prompt and adequate payment and ensuring that Medi-Cal beneficiaries have reasonable access to services.

### C.    Hospital Outpatient Services Under Medi-Cal

The methodology the Department has adopted to determine Medi-Cal rates for hospital outpatient services is contained in Attachment 4.19-B to the State Plan. (HHS00134-41.)  The State Plan further requires that when the Department sets rates, it must: (1) develop an evidentiary base or rate study resulting in the determination of a proposed rate; (2) present the proposed rate at a public hearing to gather public input; (3) determine the final rate based on the evidentiary base including the pertinent public input; and (4) establish the payment rate through adoption of regulations specifying such rates.  (HHS00134.)

---

[3]    The California State Plan is available on-line through the CMS website for the California Plan.  The website address is http://www.dhcs.ca.gov/formsandpubs/laws/pages/californistateplan.aspx.

8

The Medicaid Upper Payment Limit, 42 C.F.R. § 447.321, places a cap on the amount that a state can pay for outpatient services provided to Medicaid beneficiaries.  For private hospitals, the Medicaid Upper Payment Limit is the aggregate amount that the federal Medicare program would pay for the services in question.  For other facilities, the Medicaid Upper Payment Limit is defined as the individual provider's Medicaid costs calculated in accordance with the provisions of 75 Fed. Reg. 73972, 73975 (Nov. 30, 2010) (to be codified at 42 C.F.R. § 447).

The Medicaid Upper Payment Limit is invariably an amount lower than the amount that providers usually and customarily charge for the services in question.  The Medi-Cal outpatient rates at issue are substantially below the Medicaid Upper Payment Limit.  However, as previously discussed, for services rendered on and after April 1, 2009, California has been making supplemental payments to hospitals to bring their compensation up to the Medicaid Upper Payment Limit and CMS has approved those supplemental payments.

## D.   Legal Standard For Challenging Agency Action Under The Administrative Procedure Act

1.   The Secretary's Decision on the SPA Is Subject to APA Review.

The Secretary's decision to approve the Rate Reduction is subject to APA review.  The APA embodies a "basic presumption of judicial review" and absent an explicit statutory bar, judicial review of agency action is available except in "rare" instance where statutes are drawn in such broad terms that a "court would have no meaningful standard" to apply.  *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994).  Here, there is no statutory bar to judicial review and the Medicaid Act provides clear law to apply.  Indeed, numerous courts have previously reviewed the Secretary's approval of Medicaid rate reductions.

Under the APA, a court must hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

9

accordance with law.  5 U.S.C. § 706(2)(A).  The reviewing court must determine whether the agency used its discretion within the standards of public convenience and necessity, whether the agency disclosed the basis for its decision, and whether the agency has given "clear indication that it has exercised the discretion with which Congress has empowered it."  *Burlington Truck Lines v. United States*, 371 U.S. 156, 167-68, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962) (internal quotation marks omitted).  Additionally, the court must determine if the agency's findings were supported by substantial evidence.  *Id.* at 168.  Courts "must not rubber-stamp administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."  *Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 97, 104 S. Ct. 439, 78 L. Ed. 2d 195 (1983) (internal quotation marks and ellipses omitted); *accord Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1032 (9th Cir. 2008).

Rather, the court must set aside agency action where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983); *see also Alaska Dep't of Health & Soc. Svcs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 938 (9th Cir. 2011).

The U.S. Supreme Court articulated the standard for reviewing agency determinations in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984):

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the

10

end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842-43 (footnotes omitted).

Thus, if the statute expresses the clear intent of Congress, the agency's contrary interpretation is given no deference. If the statute is ambiguous, the agency's interpretation is given deference as long as the agency's interpretation "is a reasonable one." *Id.* at 845. Even in cases where the statute is ambiguous, a court will still overturn the Agency's interpretation if the agency's interpretation of the statute is arbitrary and capricious, an abuse of discretion, or not in accordance with the law. *Id.* at 843.

There have been a number of recent cases in which the Ninth Circuit discussed the level of deference that CMS is entitled to when a court reviews its approval of an SPA. In *Managed Pharm. Care v. Sebelius*, 716 F.3d 1235 (9th Cir. 2013), the Ninth Circuit examined the continuing validity of the *Orthopaedic* decision in reviewing approval of an SPA by the Secretary where the Secretary rejected *Orthopaedic*'s holding that Medi-Cal rates must have a reasonable relation to the costs incurred by an efficient economical provider. *Id.* at 1246-50.

In its analysis of the issue, the Ninth Circuit applied a three-part test:

In reviewing an administrative implementation of a particular statutory provision, we defer to the agency's decision (1) when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and (2) the agency interpretation claiming deference was promulgated in the exercise of that authority.

*Managed Pharm. Care*, 716 F.3d at 1246 (internal quotation marks omitted). If these first two prongs are satisfied,

[o]ur final inquiry . . . is whether the agency's [actions] were arbitrary and capricious. Agency action is arbitrary and capricious when the

> agency relies on factors Congress has not intended it to consider, fails to consider an important aspect of the problem, or offers an explanation that runs counter to the evidence before the agency. We must uphold an agency action -- even if it is made with less than ideal clarity -- as long as the agency's path may reasonably be discerned from the record.

*Id.* at 1250 (internal quotation marks and citation omitted).

The Ninth Circuit applied the three-part test to CMS's approvals of the SPAs at issue in that case.  It characterized the agency action before it as the Secretary's interpretation "that §1396(a)(30)(A) [of the Medicaid Act] does not prescribe any particular methodology a State must follow before its proposed rates may be approved."  *Id.* at 1245.  The Ninth Circuit held that the first two prongs of the test for deference were met because Congress expressly delegated to the Secretary the authority to interpret § 1396(a)(30)(A) and to determine whether a State's Medicaid program conforms to federal requirements.  *Id.* at 1247-49.

In determining that the Secretary's interpretation was within the scope of her authority, the Ninth Circuit considered the broad wording of the statute:

> The language of § 1396a(a)(30)(A) is broad and diffuse. The statute uses words like "consistent," "sufficient," "efficiency," and "economy," without describing any specific steps a State must take in order to meet those standards. The statute's amorphous language suggests that the agency's expertise is relevant in determining its application.

*Id.* at 1247-48 (internal quotation marks, brackets, and citation omitted).  The Ninth Circuit therefore held that the Secretary's interpretation of the Medicaid Act as not requiring a particular rate-setting methodology was a "permissible reading" of the Act and was thus entitled to deference.  *Id.* at 1249-50.  After it determined that the Secretary's interpretation of the Medicaid Act was entitled to deference, the Ninth Circuit looked at whether the Secretary's approvals of the SPAs were arbitrary and capricious.  *Id.* at 1250-51.  The Court looked at the extensive

administrative record and determined that there was adequate data and analysis to support the SPA approval.  *Id.* at 1251.

Shortly after issuing its decision in *Managed Pharm. Care*, the Ninth Circuit issued its decision in *Cal. Ass'n of Rural Health Clinics v. Douglas*, __ F.3d __, 2013 U.S. App. LEXIS 19215 (Sept. 17, 2013).  The Ninth Circuit in this case was asked to review a change to California's state plan that reduced the scope of Medi-Cal services for which rural health clinics would be reimbursed.  *Id.* at *3.  In response to budgeting issues, the California Legislature passed a statute that eliminated services provided in rural health clinics by dentists, podiatrists, optometrists, and chiropractors.  *Id.*  CMS approved an SPA that eliminated the associated payments and certain rural clinics sued, claiming that the SPA violated the express language of the Medicaid Act.  *Id.* at *6-7.

This time, the Ninth Circuit declined to give deference to CMS's approval of the SPA:

> It is clear that we cannot defer to CMS on any issue about which Congress has directly spoken, such that the intent of Congress is clear. While the question of statutory interpretation before us is difficult, we cannot fairly say that Congress was silent or ambiguous with respect to the issue at hand. Thus, we hold that *Chevron* deference does not apply, and we therefore do not defer to CMS's approval of the challenged SPA.

*Id.* at *15 (internal quotation marks and citations omitted).

In reaching this decision, the Ninth Circuit distinguished its holding in *Managed Pharm. Care*:

> Our recent decision in *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, (9th Cir. 2013), does not alter our view. There, we considered whether reductions in Medi-Cal reimbursement rates were consistent with Medicaid's requirement "that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). We described the statutory language there as "amorphous" and "broad and diffuse." *Managed Pharmacy*, 716 F.3d at 1247-48 (quoting *Sanchez v. Johnson*, 416 F.3d 1051, 1060 (9th Cir. 2005)). We noted that the statute "uses words like 'consistent,' 'sufficient,' 'efficiency,' and 'economy'" but "without describing any specific steps a State must take in order to meet those standards." *Id.*

13

> Thus, the imprecise language in question made the agency's expertise relevant to determining how to understand and interpret the statute. *Id.*
>
> Here, however, the statutory text does not use vague and amorphous words. Instead, it outlines specifically the types of services provided by RHCs and FQHCs that a state plan must cover. "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. Because "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. Because we do not defer to CMS's approval of the SPA, we must interpret Medicaid to determine whether § 14131.10 conflicts with federal law.

*Id.* at *16-17.  Thus, it is clear that each SPA approval must be examined on a case-by-case basis to determine the level of deference, if any, to be accorded CMS. Where the statutory language is clear and addresses the precise issue before the Court, deference cannot be given.  Moreover, summary judgment is appropriate where there is no material dispute of fact as to the arbitrariness of CMS's action. *See, e.g.*, *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 660-61 (9th Cir. 2011) (affirming grant of summary judgment because there was no material dispute of fact as to whether the Secretary considered the statutory criteria).

## IV.   **ARGUMENT**

### A.   **CMS Acted Arbitrarily And Capriciously By Approving The SPA With No Comparison Of The Access Of Medi-Cal Beneficiaries To That Of The General Public.**

CMS admits that the Medicaid Act requires Medicaid rates to be sufficient to ensure that "**care and services are available to Medicaid beneficiaries at least to the extent that care and services are available to the general public in the geographic area.**"  (HHS01951.)  This is a clear, unequivocal standard not subject to interpretation by CMS.  *See Cal. Ass'n of Rural Health Clinics*, 2013 U.S. App. LEXIS 19215, at *16-17.  Yet the record before CMS contained no data, analysis, or discussion of the general public's access to hospital outpatient services, or any comparison of the general public's access to that of Medi-Cal patients.  Instead, both the Department and CMS considered whether access by Medi-Cal patients to

14

hospital outpatient services eroded during the short seven-month period that the rate cut was in effect.

Although the administrative record consists of almost two thousand pages, the majority of the record relates to services other than hospital outpatient services. The Department's entire analysis of the adequacy of Medi-Cal hospital rates is contained in a seven-page report.  (HHS01374 – HHS01380.)  The entire discussion of outpatient services is contained in less than two pages of the report, page 5 and half of page 6.  (HHS01378-79.)  This discussion includes no mention of the level of access to hospital outpatient services by the general public and no comparison of access to these services by Medi-Cal patients.

Instead of analyzing access under the statutorily required criteria, the Department merely noted that utilization of hospital outpatient services per 1000 Medi-Cal enrollees from 2007 through 2009 did not materially change and that the percentage of hospitals that provided at least some outpatient services to Medi-Cal enrollees also did not materially change.  (HHS01378-79.)  The Department pointed out that "as the table below demonstrates, the rate of participation among hospital providers has remained constant of the [sic] 3-year period, even during the period of the payment reductions, and the vast majority of the hospitals provide these services to the [Medi-Cal] population."  (HHS01378.)

The Department's analysis fails to address the statutory criteria – whether Med-Cal patients have the same access as the general public.  The mere fact that utilization and the number of participating hospital providers did not change over a three-year period is irrelevant because there is no evidence or discussion of whether the access was the same as that enjoyed by the general public during that period (or, indeed, at any other time).

CMS did not independently analyze or identify the inadequacies in the Department's hospital outpatient report.  It relied on the report and in its SPA

approval letter stated, "Because the State implemented some reductions, CMS was able to study the correlation between the reduction to the reimbursement of those services and the change in the above metrics from SFY 2008 – SFY 2010.  Based on this analysis, including the period of rate reductions, CMS was able to conclude that the implementation of the above reimbursement reductions complied with section 1902(a)(30)(A) of the Act so that care and services were available at least to the extent that care and services are available to the general population in the geographic area."  (HHS01952.)

CMS's administrative record contains no data regarding the general public's access to hospital outpatient services.  It reveals that CMS, like the Department, relied only upon data concerning the utilization of these services by Medi-Cal patients during the period that the rate cuts were in effect in order to conclude that access was adequate.  In doing so it acted arbitrarily and capriciously because it failed to conduct the statutorily required analysis comparing the access enjoyed by the general public to that of the Medi-Cal population.

**B.    CMS Acted Arbitrarily And Capriciously By Failing to Determine Whether The Medi-Cal Rates Are Adequate To Provide Access To Hospital Emergency Services.**

Under EMTALA, hospitals are required to provide stabilizing medical treatment to all persons who come to hospital emergency departments with emergency medical conditions.  The Department admits that Medi-Cal patients heavily utilize hospital emergency departments:  "A large segment of California's Medi-Cal population is chronically ill or has complex medical needs.  Though high rates of emergency room visits may reflect the poor health status of many Medi-Cal beneficiaries and/or lack of access, high ER rates may also signal poorly managed chronic illnesses."  (HHS01884.)

Since hospitals are required to provide emergency services to all patients coming to their emergency departments, access to emergency outpatient services

will remain constant even if the rates are woefully inadequate.  Literally, hospitals would have to provide emergency medical services to Medi-Cal beneficiaries even if the Department set the rate for such services at zero.  A payment of zero certainly would not comply with the Medicaid Act even though it would have no effect on access to hospital emergency services.

The Medicaid Act requires that the Department make "**payments**" that "**are sufficient** to enlist enough providers so that **care and services** are available under the plan **at least to the extent that such care and services are available to the general population in the geographic area**."  42 U.S.C. § 1396a(a)(30)(A). Thus, the payments have to be sufficient to provide access.  The Department cannot rely upon EMTALA to provide the access despite the inadequacy of the rates.  Yet that is exactly what the Department has done.  In its analysis, the Department used utilization of outpatient services as a proxy for access.  By doing so, it included utilization of outpatient emergency services, which are not at all rate sensitive.  Thus, the Department's (and CMS's) conclusion that access was not negatively affected by the rate cut was not valid because EMTALA guarantees access to emergency services, which are a large part of the total volume of hospital outpatient services.  Because of this, it would be impossible to tell from merely looking at overall outpatient-services-utilization statistics whether the rates of payment met the statutory requirement of affording access at the same level available to the general population.  The Department did nothing to determine what overall access to hospital outpatient services (or access to emergency services standing alone) would have been absent EMTALA.  Thus, it is entirely possible that the utilization largely resulted from EMTALA, and that the rates would not have been adequate to provide access if EMTALA did not exist.

The recent case of *Christ the King Manor v. Secretary HHS*, __ F.3d __, 2013 U.S. App. LEXIS 19317 (3d Cir. Sept. 19, 2013), is directly on point.  In that

case, the Pennsylvania Legislature authorized the use of a Budget Adjustment Factor ("BAF") designed to reduce Medicaid rates in order to keep Medicaid expenditures within a budget set by the legislature. *Id.* at *7-8. For example, if the BAF was set at 0.9 the Medicaid rates would be reduced by 10% and providers would receive 90% of the applicable rates. *Id.* at *8.

In 2008, the Pennsylvania Legislature passed legislation and a budget that set the BAF at 0.90891 for the 2008-09 fiscal year, resulting in a 9.109 percent reduction in rates paid to nursing facilities (a percentage very similar to the 10% rate cut at issue here). *Id.* at *14-15 & n.10. Pennsylvania submitted an SPA implementing the rate cut to CMS and CMS approved it. *Id.* at *16-18. A group of nursing facilities sued CMS, seeking to overturn CMS's approval of the rate cut as being contrary to law. *Id.* at *19-20. The main argument that the plaintiffs raised in support of their claims was that the administrative record was "silent" with respect to CMS's consideration of the statutory requirement that payment be consistent with quality of care. *Id.* at *25.

The Third Circuit analyzed the issues before it, and applied the same standard that the Ninth Circuit applied in *Managed Pharm. Care*:

> In *Managed Pharmacy Care,* for example, the Ninth Circuit concluded that "Congress explicitly granted the Secretary authority to determine whether a state's Medicaid plan complies with federal law," and that "[i]t is well within the Secretary's mandate to interpret the statute via case-by-case SPA adjudication." . . . **We agree.**

*Id.* at *33-34 (emphasis added). Thus, the Third Circuit, like the Ninth Circuit, held that "SPA approvals are . . . the type of agency action that warrants *Chevron* deference." *Id.* at 35. Although it applied *Chevron* deference, the Third Circuit ultimately concluded that CMS's approval of the SPA was arbitrary and capricious under the APA. *Id.* at *58-59. In reaching this determination, the Third Circuit held that the administrative record did not contain an analysis of the impact that the

18

rate cut would have on quality of care, one of the statutorily required criteria. *Id.* at *57.

One of CMS's main arguments in support of its SPA approval was that an analysis of the adequacy of the rates to cover quality care was unnecessary because there were other statutory provisions that required nursing facilities to provide high quality care:

> [T]he Federal defendants describe provisions of the Nursing Home Reform Act, 42 U.S.C. §§1395i-3, 1396, that allow for "oversight and inspection of nursing facilities" and "require certification that participating facilities satisfy certain 'quality of care' standards." They also note that in 2005 Pennsylvania instructed nursing facilities that they have an obligation "to provide appropriate high-quality care" that "exists independent of any particular payment rate or any features of the rate-setting methodology."

*Id.* at *49-50 (citation and brackets omitted).

The Third Circuit rejected CMS's reliance on these statutes as a basis for meeting the rate setting requirements. *Id.* at *50-51. The Third Circuit held that CMS's reliance on statutes regulating nursing homes to meet the quality of care requirement "**ignores fiscal realities by implying that a state can assure quality of care by holding nursing homes to high standards while underfunding them.**" *Id.* at *51. Thus, the fact that a health provider is legally required to provide quality care is not justification for setting rates too low to support the provision of quality care. *Id.*

Likewise here, in considering access to hospital outpatient services, CMS must determine that the rates of payment themselves are adequate to assure access. As was the case in *Christ the King Manor*, this is a clear statutory requirement and not subject to interpretation. It is not sufficient for CMS to rely on the fact that EMTALA requires hospitals to provide emergency medical services to all patients, including Medi-Cal patients, to satisfy the access requirement. The rates themselves must be sufficient to assure access.

19

The administrative record is devoid of any analysis of whether the rates are adequate to provide access.  There is data regarding the percentage of hospitals that provided outpatient services to Medi-Cal beneficiaries, but no discussion of whether the services provided were emergency services.  Likewise, the data reflecting Medi-Cal beneficiaries' utilization of hospital outpatient services does not reflect whether the services were for the diagnosis or treatment of an emergency medical condition.

As has previously been discussed, the administrative record reflects the fact that Medi-Cal patients "have high rates of emergency room visits."  (HHS01884.)  Yet there is no discussion or analysis of whether the rates, or the rates after the rate cut, were adequate to assure access to these services.  Since hospitals are legally required to provide emergency medical care irrespective of the ability to pay, access to such care will remain constant, even in the absence of adequate rates.  As noted, the Department could pay nothing for such care and access would likely remain unchanged.

Thus, when analyzing the adequacy of the Medi-Cal rates for access to emergency outpatient services, it is arbitrary and capricious for the Department (and for CMS) to rely solely on data relating to the utilization of such services as a proxy for access, when access is guaranteed by law.  CMS must require an analysis demonstrating that the rates would have been adequate to provide the required level of access in the absence of EMTALA.  Since there is no such analysis in the administrative record (or even raw data on which such an analysis could be based), CMS's approval of the rate cuts that relate to emergency hospital outpatient services was arbitrary and capricious and should be reversed.

## V.    CONCLUSION

California cut the rates for hospital outpatient services for purely budgetary reasons.  California's after-the-fact attempt to justify the cuts – conducted in

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
CASE NO.  CV-11-10638 SVW (MANx)

4844-1784-1686.3

collaboration with CMS after CMS initially denied the cuts – fails to address the statutory requirement that the rates are sufficient to assure that "**care and services are available under the plan at least to the extent that care and services are available to the general population in the geographic area.**" 42 U.S.C. § 1396a(a)(30)(A).  Instead, California and CMS looked only at whether there was a material reduction of utilization during the eight-month period when California implemented the rate cut without CMS approval in 2008 – despite the fact that there is nothing in the administrative record to establish that the rates met the statutory access requirement prior to the rate cut.

California and CMS have likewise done nothing to determine whether the access that Medi-Cal beneficiaries had to hospital outpatient emergency services resulted from the rates, or whether those services were provided because they are required to be provided by EMTALA even though the rates were inadequate.  The expansion of the Medi-Cal program under the Affordable Care Act will put a great strain on California healthcare providers and particularly on hospitals.  It is essential that CMS enforce the rate setting requirements of the Medicaid Act to ensure that the rates are adequate to provide access to services and that states are not allowed to use EMTALA to mask the problems caused by inadequate rates.

DATED:  NOVEMBER 7, 2013                    **FOLEY & LARDNER LLP**
                                           ROBERT C. LEVENTHAL
                                           A. JOEL RICHLIN


                                  BY:
                                        /S/ *ROBERT C. LEVENTHAL*
                                        ROBERT C. LEVENTHAL
                                        ATTORNEYS FOR PLAINTIFFS

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
CASE NO.  CV-11-10638 SVW (MANx)

4844-1784-1686.3