**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE: 213.972.4500
FACSIMILE: 213.486.0065

ROBERT C. LEVENTHAL, CA Bar No. 119969
RLEVENTHAL@FOLEY.COM

A. JOEL RICHLIN, CA Bar No. 246318
JRICHLIN@FOLEY.COM

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOSPITAL OF BARSTOW, INC., et al., | Case No: CV-11-10638 SVW (MANx) |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| KATHLEEN SEBELIUS, SECRETARY OF UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | Date: January 6, 2014<br>Time: 1:30 p.m.<br>Ctrm: 6 |
| Defendant. | Complaint Filed: December 22, 2011<br>FAC Filed: January 27, 2012<br>Judge: Hon. Stephen V. Wilson |

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The briefing on the cross-motions for summary judgment has clarified the issues raised by the parties and nicely framed the issues that need to be decided by the Court.  Plaintiffs concede that under the Ninth Circuit Court of Appeals' decision in *Managed Pharm. Care v. Sebelius*, 716 F.3d 1235 (9th Cir. 2013), it is no longer possible to argue in a District Court in the Ninth Circuit that a state is required to perform a cost study or to set rates that are reasonably related to costs (although cost can still be a relevant factor that can be considered in the rate setting process).

The parties agree that the relevant question before the Court is whether the Secretary correctly determined that the rate cut at issue resulted in rates that met the statutory requirement that the payments be sufficient so that "care and services are available to Medicaid beneficiaries **at least to the extent** that care and services are available to the general public in the geographic area." 42 U.S.C. § 1396a(a)(30)(A) (emphasis added).  They differ regarding whether CMS met this clear statutory requirement.

In short, Plaintiffs allege that the Secretary did not comply with the statutory requirements because there is no comparison in the administrative record of the access to hospital outpatient care and services that Medi-Cal enrollees have with the access enjoyed by the general public.  The Secretary's sole analysis relates to whether Medi-Cal patients' access to outpatient services decreased during a short eight-month period when the 10% rate cut at issue was actually implemented.

The Secretary's Cross-Motion for Summary Judgment ("Motion") concedes, as it must, that the Secretary relied upon the lack of change in utilization during the eight-month rate cut and did not determine whether, **prior to the rate cut,** access was adequate.  Furthermore the Secretary concedes that part of the reason that utilization did not change is that immediately after the rate cuts ended "[o]n April

1, 2009, California implemented a Supplemental Payment Program that provides periodic supplemental payments to hospitals participating in the Medi-Cal program." (Motion at 7:24-28.) This concession is a tacit admission that the rates standing alone are not sufficient to provide access and that these supplemental payments are needed. It is disingenuous for CMS to claim that a 10% rate cut was appropriate, followed by an immediate rate increase composed of supplemental payments. The Medi-Cal rates should be set at appropriate levels at all times. It is arbitrary and capricious to allow the State to set the rates so low that supplemental payments are necessary.

Perhaps more importantly, the Secretary's analysis ignored the fact that the Emergency Treatment and Active Labor Act ("EMTALA") guarantees that Medi-Cal patients have the same access as the general public to hospital emergency services (which make up a significant part of hospital outpatient services). Since hospitals are required to provide emergency services without regard to the patient's ability to pay, equal access to emergency services would exist even if the Medi-Cal rates for such services were set at zero. Thus, merely looking at access when analyzing Medi-Cal rates for emergency services is inadequate, because access is a given and will exist irrespective of the adequacy of the rates. The Medicaid Act requires that **the payments** to the health-care providers be sufficient to insure access and does not allow states to rely on EMTALA to provide access despite inadequate rates. Thus, additional analysis is needed in order to determine if the rates would be adequate to provide access absent EMTALA.

II. **ARGUMENT**

    A. **The Administrative Record Reveals That The Secretary Failed To Perform The Statutorily Required Analysis – A Comparison Of Medi-Cal Beneficiaries' Access With That Of The General Public.**

The Secretary admits, as she must, that the Medicaid Act requires that the rates be sufficient so that "care and services are available to Medicaid beneficiaries **at least to the extent that care and services are available to the general public**

in the geographic area." This standard is set forth in clear statutory language. As the Court explained in *Cal. Ass'n of Rural Health Clinics v. Douglas*, __ F.3d __, 2013 U.S. App. LEXIS 19215, at *16-17 (Sept. 17, 2013):

> Our recent decision in *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, (9th Cir. 2013), does not alter our view. There, we considered whether reductions in Medi-Cal reimbursement rates were consistent with Medicaid's requirement "that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). We described the statutory language there as "amorphous" and "broad and diffuse." *Managed Pharmacy*, 716 F.3d at 1247-48 (quoting *Sanchez v. Johnson*, 416 F.3d 1051, 1060 (9th Cir. 2005)). We noted that the statute "uses words like 'consistent,' 'sufficient,' 'efficiency,' and 'economy'" but "without describing any specific steps a State must take in order to meet those standards." *Id.* Thus, the imprecise language in question made the agency's expertise relevant to determining how to understand and interpret the statute. *Id.*
>
> Here, however, the statutory text does not use vague and amorphous words. Instead, it outlines specifically the types of services provided by RHCs and FQHCs that a state plan must cover. "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. Because "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."

The statutory language at issue in the present case, unlike the language at issue in *Managed Pharm. Care*, is not "amorphous," "broad," or "diffuse." Instead, like the language at issue in *Cal. Ass'n of Rural Health Clinics*, it "outlines specifically" the standard to be applied. It requires, in the most express language possible, a comparison of the access to care and services enjoyed by the general public with the access available to Medi-Cal patients and requires that Medi-Cal patients have access "**at least to the extent that care and services are available to the general public.**" Thus, the Act expresses the clear intent of Congress and requires a comparison of the access that the general public has with that of Medi-Cal patients. The Secretary appears to admit as much and does not claim that she can somehow interpret away the access requirement.

Although the Secretary claims in conclusory terms that she considered the statutorily required elements, it is clear from the administrative record and from the

3

1  arguments made in support of the Secretary's Motion that she did not.  Instead of
2  comparing the access of Medi-Cal patients with that of the general public, she
3  simply compared the access Medi-Cal patients had prior to the rate cut with the
4  access they had after the rate cut and **ignored the requirement that she compare**
5  **Medi-Cal access with that of the general public**.

6  The Secretary admits as much in her Motion.  She states, "CMS reasonably
7  concluded that the challenged rate reductions would not harm beneficiary access to
8  hospital services," thereby admitting that she looked at whether the eight-month
9  rate cut adversely impacted access, not whether access was adequate to being with.
10 (Motion at 20:1-3 (emphasis omitted).)

11 She also claims that she relied upon the State's "comprehensive access
12 analysis, [A.R.] at HHS01598-1681."  (Motion at 20:20-22.)  An examination of
13 this document reveals that it contains no comparison of the access to hospital
14 outpatient services that Medi-Cal patients have with that of the general public.
15 Instead, it contains a document entitled "Measuring Access to Medi-Cal Covered
16 Services" which sets forth methodologies for measuring access to various medical
17 services, but contains no meaningful comparison of Medi-Cal recipients' access to
18 hospital outpatient services with that of the general public.

19 The Secretary admits that she relied upon data regarding the number of
20 hospitals that participated in the Medi-Cal program.  However, as discussed in
21 Plaintiffs' Motion for Summary Judgment, hospitals are required to provide
22 emergency services under EMTALA.  Thus, every hospital that operates an
23 emergency room is virtually guaranteed to provide Medi-Cal patients with
24 emergency medical services.  Hospitals would have to provide these services to
25 Medi-Cal beneficiaries (and to participate in the Medi-Cal program in order to get
26 paid) even if the rates were set at zero.  Thus, data regarding the number of
27 hospitals that provide Medi-Cal outpatient services is irrelevant to determining
28

4
PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO.  CV-11-10638 SVW (MANx)

4820-3663-0295.2

whether the rates are adequate to provide access.[1] It only shows that hospitals that were forced to give access under EMTALA billed Medi-Cal for their services.

The Secretary tacitly admits that the rates standing alone are not adequate to provide access. For example, the Secretary relies on the fact that many "hospitals have received substantial increases in Medicaid reimbursement from the State's Supplemental Payment Program." (Motion at 23:1-4.) The Supplemental Payment Program was implemented after the rate cuts had ended and demonstrates that the rates standing alone were insufficient to maintain quality and insure access. In short, California should be required to set rates that meet the statutory access requirement and should not be allowed to pay amounts that are insufficient to insure access even for a short eight-month period. The fact that "substantial increases" under the Supplemental Payment Program were necessary (and were approved by CMS) constitutes a tacit admission that the rates, standing alone, are inadequate. (*Id.* at 23:2.)

### B. The Secretary Violated the Medicaid Act by Ignoring The Impact Of EMTALA As A Source Of Access To Medi-Cal Services.

The Secretary does not even claim that she considered the impact of EMTALA on access to hospital services and offers no explanation for its omission. (Motion at 23:8-17.) Since EMTALA requires hospitals to provide diagnosis and treatment of emergency medical conditions without considering the patient's ability to pay, any access analysis that fails to consider the impact of EMTALA cannot, by definition, have determined that the rates are adequate to provide access. The access might result from the hospitals' EMTALA obligations despite inadequate Medi-Cal rates.

---

[1] Likewise, the number of hospitals that contract to provide inpatient services is irrelevant. The rates paid for inpatient services are negotiated between the hospital and the Medi-Cal program. They are different from the outpatient rates at issue in this lawsuit.

5
PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-11-10638 SVW (MANx)

4820-3663-0295.2

The Medi-Cal statute is clear.  Participating states are required to pay for the services provided to Medi-Cal beneficiaries.  The amount that they pay has to be sufficient to create access to care and services "**at least to the extent that care and services are available to the general public.**"  42 U.S.C. § 1396a(a)(30)(A) (emphasis added).  The Act does not allow states to rely upon EMTALA to create access (or to rely upon licensing requirements or charity-care obligations to create uncompensated access).  Because of EMTALA, hospitals are in a vulnerable position because they serve as a safety net for patients who would otherwise be unable to obtain care.  For example, if the Medi-Cal rates for physician services are too low to provide adequate access, the Medi-Cal beneficiaries who are unable to access physician services will end up in hospital emergency rooms.  As stated in the administrative record, "**Though high rates of emergency room visits** may reflect the poor health status of many Medi-Cal beneficiaries and/or **lack of access**, high ER rates may also signal poorly managed chronic illnesses."  (HHS01884 (emphasis added).)

The administrative record thus acknowledges that Medi-Cal patients heavily utilize emergency rooms and that such heavy utilization can result from a "lack of access" to more appropriate care modalities.  Given the high utilization, it is particularly important that the Medi-Cal rates for emergency services are adequate and that California is not allowed to rely on EMTALA to mask inadequate rates.  Inadequate Medi-Cal rates to other providers (such as physicians) result in patients being forced to receive treatment in hospital emergency rooms, the treatment location of last resort where treatment will be provided even in the absence of adequate compensation.  Thus, inadequate rates paid not only to hospitals, but also to other providers, are masked by the requirements of EMTALA, and the heavy burden of caring for Medi-Cal patients without adequate compensation is placed on hospitals because of the mandates of EMTALA.

To look at access to hospital outpatient services (which include a heavy component of emergency medical services) without even considering the impact of EMTALA, is a meaningless exercise.  The clear congressional intent in the Medicaid Act is to require the states to pay for the services provided to Medicaid recipients and for those payments to be sufficient to obtain access.  Such congressional intent cannot be fulfilled if states are allowed to rely on EMTALA instead of setting adequate rates for hospital emergency services.[2]

## III. CONCLUSION

The administrative record in this case is clear and the facts are undisputed: The Secretary did not compare the access of Medi-Cal patients to that of the general public and did not consider whether the access that Medi-Cal patients have to hospital emergency services resulted from the mandates of EMTALA and not from the Medi-Cal rates.  The Secretary thus acted arbitrarily and capriciously and contrary to the clear mandate of the Medicaid statute that requires the rates be set at high enough levels to ensure that Medi-Cal beneficiaries have the same access to care as the general public.  The Secretary's Motion should therefore be denied and the Plaintiffs' Motion for Summary Judgment granted.

DATED:  DECEMBER 9, 2013

**FOLEY & LARDNER LLP**
ROBERT C. LEVENTHAL
A. JOEL RICHLIN

BY:      /S/ *ROBERT C. LEVENTHAL*
ROBERT C. LEVENTHAL
ATTORNEYS FOR PLAINTIFFS

---

[2] The impact of EMTALA extends further than just the emergency room. Hospitals can be driven to open outpatient clinics in order to have a more cost effective venue for treating patients that would otherwise show up in the emergency room.